[No. B073387. Second Dist., Div. One. Dec. 28, 1995.]

DOMAR ELECTRIC, INC., Plaintiff and Appellant, v.
CITY OF LOS ANGELES, Defendant and Respondent;
BAILEY CONTROLS COMPANY, Intervener and Respondent.

COUNSEL

Kamine, Steiner & Ungerer, Bernard S. Kamine, Phyllis M. Ungerer and Maurya Hogan for Plaintiff and Appellant.

James K. Hahn, City Attorney, Pedro B. Echeverria, John F. Haggerty and Christopher M. Westhoff, Assistant City Attorneys, for Defendant and Respondent.

Louise H. Renne, City Attorney (San Francisco), G. Scott Emblidge, Deputy City Attorney, Mara E. Rosales, Theodore Hsien Wang, William C. McNeill III, Judith Kurtz and Kevin Baker as Amici Curiae on behalf of Defendant and Respondent.

Jones, Day, Reavis & Pogue, Gerald W. Palmer and Patricia W. Davies for Intervener and Respondent.

OPINION

MASTERSON, J.—Domar Electric, Inc. (Domar) submitted the lowest monetary bid on a public works project in the City of Los Angeles (the City). It was not awarded the contract because it failed to document that it had complied with a subcontractor outreach program. Domar challenged the decision to award the contract to another bidder on the grounds that the outreach program violated the City's charter, Public Contract Code section 2000, and the equal protection clause of the United States Constitution.

In an opinion filed in October 1993, this court held that the outreach program violated the City's charter. The City successfully petitioned for review. The Supreme Court, finding no inconsistency between the outreach program and the City's charter, reversed our judgment and remanded the matter to permit us to consider Domar's remaining contentions. (*Domar Electric, Inc.* v. *City of Los Angeles* (1994) 9 Cal.4th 161, 168-169, 179 [36

Cal.Rptr.2d 521, 885 P.2d 934] (*Domar I*).) We do so now, and find both to be lacking in merit.

## BACKGROUND

We place Domar's challenges to the outreach program in the historical context from which they arise:

Public works contracts awarded under state law must generally be let to the "lowest responsible bidder." (See, e.g., Pub. Contract Code, §§ 20128, 20162.) Similarly, the City's charter requires that its contracts "be let to the lowest and best regular responsible bidder."[1] (L.A. City Charter, § 386(f).)

In 1980, the Ninth Circuit considered a challenge to an affirmative action policy adopted by the San Francisco Board of Education which required that bidders on construction contracts either be minority prime contractors or utilize minority subcontractors for 25 percent of the dollar amount of the contract work. (*Associated Gen., etc.* v. *San Francisco Unified Sch.* (9th Cir. 1980) 616 F.2d 1381, 1383.) The policy was struck down because it was inconsistent with the statutory requirement that a contract be let to the "lowest responsible bidder," as defined by the California Supreme Court in *City of Inglewood-L.A. County Civic Center Auth.* v. *Superior Court, supra,* 7 Cal.3d 861. (616 F.2d at p. 1385.)

In March 1983, the City's mayor issued executive directive No. 1-B, which stated that it was the policy of the City "to utilize Minority and Women-Owned Business Enterprise[s] (MBE's) and (WBE's) in all aspects of contracting relating to procurement, construction, and personal services."[2] The directive further declared that agencies of the City "will ensure that Minority Business Enterprises have the maximum opportunity to participate in the performance of contracts and subcontracts. In this regard, the City will

---

[1]The term "lowest responsible bidder" generally means the lowest bidder whose offer best responds in quality, fitness, and capacity to the particular requirements of the proposed work. As used in this definition, the word "best" does not connote relative superiority. Rather, it permits a bidder to be rejected only if its product or workmanship has been found to be unsatisfactory. (*City of Ingelwood-L.A. County Civic Center Auth.* v. *Superior Court* (1972) 7 Cal.3d 861, 867-868, fn. 5 [103 Cal.Rptr. 689, 500 P.2d 601].)

The parties have not suggested that there is any significance to the charter's addition of the words "and best regular" to the statutory definition.

[2]In a footnote, the directive defined MBE's and WBE's (minority- and women-owned business enterprises) as "any business, bank or financial institution which is owned and operated by a minority group member or woman, or such business, bank or financial institution of whom 50% or more of it's [*sic*] partners or stockholders are minority group members or women. If the business is publicly owned, the minority members or stockholders must have at least 51% interest in the business and possess control over management capital earnings."

take all responsible steps to ensure that Minority and Women-Owned Business Enterprises have the maximum opportunity to compete for and perform contracts and services." The directive also contained general guidelines for its implementation.[3]

In March 1985, the United States District Court for the Northern District of California considered a challenge to an Alameda County affirmative action program pursuant to which prime contractors were required to make a good faith effort to achieve 10 percent minority subcontractor participation in their bids. (*M.G.M. Const. Co.* v. *Alameda County* (N.D.Cal. 1985) 615 F.Supp. 149, 150.) The plaintiff in that case had submitted the lowest monetary bid on a project, but had not been awarded the job because minority subcontractors comprised less than 1 percent of its bid. (*Ibid.*) Relying on the "lowest responsible bidder" language of Public Contract Code section 20128 and the decisions in *City of Inglewood-L.A. County Civic Center Auth.* v. *Superior Court, supra,* 7 Cal.3d 861, and *Associated Gen., etc.* v. *San Francisco Unified Sch., supra,* 616 F.2d 1381, the *M.G.M.* court had "no difficulty concluding that the action . . . denying the . . . contract to the plaintiff violated state law." (615 F.Supp. at pp. 150-151.)

Two months later, in response to the *M.G.M.* decision, Alameda County sponsored an amendment to Assembly Bill No. 1464 which added Public Contract Code section 2000. (See Assem. 3d reading of Assem. Bill No. 1464 (1984-1985 Reg. Sess.) as amended May 15, 1985.) As enacted, section 2000 created various exceptions to the "lowest responsible bidder" rule, including the following: "(a) Notwithstanding any other provision of law requiring a local agency to award contracts to the lowest responsible bidder, any local agency may require that a contract be awarded to the lowest responsible bidder who also does either of the following: [¶] (1) Meets goals and requirements established by the local agency relating to participation in the contract by minority business enterprises and women business enterprises. If the bidder does not meet the goals and requirements established by the local agency for that participation, the local agency shall evaluate the good faith effort of the bidder to comply with those goals and requirements as provided in paragraph (2). [¶] (2) Makes a good faith effort, in accordance with the criteria established pursuant to subdivision (b), prior to the time bids are opened, to comply with the goals and requirements

---

[3]Apparently, pursuant to these guidelines, programs were implemented which set specific goals for MBE/WBE participation in contracts.

established by the local agency relating to participation in the contract by minority or women business enterprises."[4]

In January 1989, the United States Supreme Court rendered its decision in *Richmond* v. *J. A. Croson Co.* (1989) 488 U.S. 469 [102 L.Ed.2d 854, 109 S.Ct. 706]. As characterized by our Supreme Court, *Croson* "involved a challenge to a municipality's program that required prime contractors awarded city construction contracts to subcontract at least 30 percent of the dollar amount of each contract to minority firms. In that case, the high court found that the mandatory set-aside for minority subcontractors violated the equal protection clause of the United States Constitution because there was

---

[4]Public Contract Code section 2000, subdivision (b), provides: "(1) The bidder attended any presolicitation or prebid meetings that were scheduled by the local agency to inform all bidders of the minority and women business enterprise program requirements for the project for which the contract will be awarded. A local agency may waive this requirement if it determines that the bidder is informed as to those program requirements. [¶] (2) The bidder identified and selected specific items of the project for which the contract will be awarded to be performed by minority or women business enterprises to provide an opportunity for participation by those enterprises. [¶] (3) The bidder advertised, not less than 10 calendar days before the date the bids are opened, in one or more daily or weekly newspapers, trade association publications, minority or trade oriented publications, trade journals, or other media, specified by the local agency for minority or women business enterprises that are interested in participating in the project. This paragraph applies only if the local agency gave public notice of the project not less than 15 calendar days prior to the date the bids are opened. [¶] (4) The bidder provided written notice of his or her interest in bidding on the contract to the number of minority or women business enterprises required to be notified by the project specifications not less than 10 calendar days prior to the opening of bids. To the extent possible, the local agency shall make available to the bidder not less than 15 calendar days prior to the date the bids are opened a list or a source of lists of enterprises which are certified by the local agency as minority or women business enterprises. If the local agency does not provide that list or source of lists to the bidder, the bidder may utilize the list of certified minority or women business enterprises prepared by the Department of Transportation pursuant to Section 14030.5 of the Government Code for this purpose. [¶] (5) The bidder followed up initial solicitations of interest by contacting the enterprises to determine with certainty whether the enterprises were interested in performing specific items of the project. [¶] (6) The bidder provided interested minority and women business enterprises with information about the plans, specifications, and requirements for the selected subcontracting or material supply work. [¶] (7) The bidder requested assistance from minority and women community organizations; minority and women contractor groups; local, state, or federal minority and women business assistance offices; or other organizations that provide assistance in the recruitment and placement of minority or women business enterprises, if any are available. [¶] (8) The bidder negotiated in good faith with the minority or women business enterprises, and did not unjustifiably reject as unsatisfactory bids prepared by any minority or women business enterprises, as determined by the local agency. [¶] (9) Where applicable, the bidder advised and made efforts to assist interested minority and women business enterprises in obtaining bonds, lines of credit, or insurance required by the local agency or contractor. [¶] (10) The bidder's efforts to obtain minority and women business enterprise participation could reasonably be expected by the local agency to produce a level of participation sufficient to meet the goals and requirements of the local agency."

no direct evidence of past discrimination." (*Domar I, supra*, 9 Cal.4th at p. 166.)

In March 1989, the City's mayor issued executive directive No. 1-C, which was "intended to clarify the implementation of Executive Directive No. 1-B in light of the *Richmond* v. *Croson* decision. . . ."[5] Although directive No. 1-C declared that directive No. 1-B "remains intact and in force," it further stated: "It is the policy of the City of Los Angeles to provide Minority Business Enterprises (MBEs), Women Business Enterprises (WBEs) and all other business enterprises [OBE's] an equal opportunity to participate in the performance of all city contracts. Bidders and proposers shall assist the city in implementing this policy by taking all reasonable steps to ensure that all available business enterprises, including local MBEs and WBEs, have an equal opportunity to compete for and participate in city contracts." Under executive directive No. 1-C, contracting agencies of the City were directed to evaluate the good faith efforts made by bidders and proposers in their outreach to MBE's, WBE's and OBE's (other business enterprises) according to 10 factors which parallel the 10 criteria listed in Public Contract Code section 2000, subdivision (b)(1)-(b)(10).[6]

In 1990, the Los Angeles Board of Public Works (the Board) established an outreach program for contracts greater than $100,000 that was patterned after executive directive No. 1-C.[7] Under the Board's program, a bidder's good faith in conducting outreach efforts to MBE, WBE and OBE subcontractors[8] is to be evaluated by criteria which parallel the mayor's directive.[9] Although the directive and the outreach program include blank spaces for the

---

[5]The City additionally responded to *Croson* by hiring an outside company to conduct a study for the purpose of compiling direct evidence of past discrimination against women and minorities. Originally, the study was to have been completed by December 1992. The deadline was later extended to May 1993. The appellate record is silent as to the current status of that study.

[6]The main difference between the statute and the executive directive is that the tenth item of the statute is the first item of the executive directive. In the executive directive, that item reads as follows: "The bidder's or proposer's efforts to obtain participation by MBEs, WBEs and other business enterprises could reasonably be expected by the Awarding Authority to produce a level of participation by interested sub-contractors, including ___ percent MBE and ___ percent WBE as established by the Awarding Authority."

[7]The copy of the program which is included in the appellate record bears the date January 23, 1990.

[8]The program defines "other business enterprise" as "any subcontractor which does not otherwise qualify as a Minority or Women Business Enterprise."

[9]The Board's program lists the following 10 items: "[¶] 1. The bidder has made a good faith effort to obtain sub-bid participation by MBEs, WBEs and OBEs which could be expected by the Board to produce a reasonable level of participation by interested business enterprises, including the MBE and WBE percentages set forth by paragraph B herein. [Paragraph B calls for '1 percent MBE and/or WBE' participation.] [¶] 2. The bidder has attended the pre-bid meeting scheduled by the Board to inform all bidders of the requirements

percentage of participation of MBE's and WBE's which might be expected to result from the outreach efforts in each particular bid situation (1 percent for the project at issue here), the directive makes clear that achievement of the expected level of participation is only one of 10 indicators of good faith, and that the failure to achieve that level does not by itself disqualify any bidder from consideration for a contract award nor result in a determination of lack of reasonable MBE/WBE participation. (See *Domar I, supra*, 9 Cal.4th at p. 175.)

In a letter dated June 5, 1991, the City's mayor informed the president of the public works commission that the good faith effort guidelines of executive directive No. 1-C had been revised to eliminate consideration of the item pertaining to the achievement of an expected level of MBE and WBE participation in evaluating the adequacy of a bidder's outreach efforts.[10] The letter further requested that the commission move expeditiously to adopt the revised guidelines.

---

for the project for which the contract will be awarded. The Board may waive this requirement only if the bidder certifies in writing it was already informed as to those project requirements prior to the pre-bid meeting. [¶] 3. The bidder has identified and selected specific work items in the project to be performed by sub-bidder/subcontractors in order to provide an opportunity for participation by MBEs, WBEs and OBEs. Upon making this determination, the bidder subdivided the total contract work requirements into smaller portions or quantities to permit maximum active participation of MBEs, WBEs and OBEs. [¶] 4. Not less than ten (10) calendar days prior to the submission of bids, the bidder advertised for sub-bids from interested business enterprises in one or more daily or weekly newspapers, trade association publications, minority or trade oriented publications, trade journals, or other media specified by the Board. [¶] 5. The bidder has provided written notice of its interest in receiving sub-bids on the contract to those business enterprises, including MBEs and WBEs having an interest in participation in the selected work items. All notices of interest shall be provided not less than ten (10) calendar days prior to the date the bids are required to be submitted. In all instances, bidder can document that invitations for sub-bid/subcontracting was [*sic*] sent to available MBEs, WBEs and OBEs for each item of work to be performed. [¶] 6. The bidder has documented efforts to follow-up initial solicitations of sub-bid interest by contacting the affected business enterprises to determine with certainty whether said enterprises were interested in performing specific portions of the project work. [¶] 7. The bidder has provided interested sub-bid enterprises with information about the plans, specifications and requirements for the selected sub-bid/subcontracting work. [¶] 8. The bidder requested assistance from organizations that provide assistance in the recruitment and placement of MBEs, WBEs and OBEs not less than 15 calendar days prior to the submission of bids. It should be noted that any legitimate association concerning MBE/WBE/OBE activities not on the following list may also be contacted for this purpose. [¶] 9. The bidder has negotiated in good faith with interested MBEs, WBEs and OBEs and did not unjustifiably reject as unsatisfactory the sub-bids prepared by any enterprise. As documentation, the bidder can submit a list of all sub-bidders for each item of work for which bids were solicited, including dollar amounts of potential work for MBEs, WBEs and OBEs. [¶] 10. The bidder has documented efforts to advise and assist interested MBEs, WBEs and OBEs in obtaining bonds, lines of credit, and insurance required by the Board or contractor."

[10]This item appears as No. 1 in directive No. 1-C and the Board's outreach program, and is subdivision (b)(10) of Public Contract Code section 2000.

In October 1991, the Board issued a request for bids on a contract to provide a computer control system for the Hyperion Secondary Sewage Treatment Plant. The bid package specified that bidders would be required to submit documentation of their compliance with the outreach program pursuant to a "good faith documentation checklist."[11] The bid package further provided that the bidder was required to submit the good faith checklist and supporting documentation within three days after the bid had been received by the Board.

Three companies submitted bids for the project. Of these, Domar submitted the lowest monetary bid of $3,335,450. However, Domar failed to provide the required good-faith-effort documentation to the Board within the three-day deadline.[12] Based on this failure, Domar's bid was declared "nonresponsive," and the contract was awarded to the next lowest monetary bidder—Bailey Controls Company (Bailey), which had submitted a bid of $3,987,622.

Domar thereafter filed a petition for a writ of mandate and/or prohibition in the superior court seeking, among other things, to prevent the City from entering a contract on the Hyperion project with any prime contractor other than itself. Following the issuance of an alternative writ, the superior court denied Domar's petition. This court and the Supreme Court also denied writ relief. After a final judgment was entered in the superior court, Domar appealed on the grounds that the outreach program: (1) violates the City's charter; (2) violates Public Contract Code section 2000, which permits compliance with an outreach program to be predicated on *either* demonstrating good faith in seeking MBE and WBE participation *or* meeting specific goals and requirements for such participation; and (3) violates the equal protection clause of the Fourteenth Amendment to United States Constitution, as interpreted in *Richmond* v. *J. A. Croson Co.*, *supra*, 488 U.S. 469.

In a split decision, we reversed the superior court judgment on the ground that the Board's outreach program violated the City's charter. The Supreme Court disagreed for the reasons set forth in *Domar I*, and remanded the matter to permit us to consider Domar's second and third contentions. We have requested, and received, supplemental briefing on these issues. We find

---

[11]The public works commission apparently did not move expeditiously on the mayor's letter of June 5. Despite the instructions in that letter, the good faith document checklist that was included in the bid package continued to provide that "1 percent MBE and/or WBE" participation could be expected to result from a bidder's outreach efforts.

[12]The City concedes that the documentation ultimately provided by Domar demonstrated that it had met the goal of 1 percent MBE/WBE participation. Domar has not raised a due process challenge to the Board's failure to accept the bid based on its failure to submit the required documentation in a timely manner.

that Domar is not entitled to be awarded the contract on the Hyperion Secondary Sewage Treatment Plant project.

DISCUSSION

1. *Public Contract Code Section 2000*

 a. *The City is bound by Public Contract Code section 2000*

The City is a chartered city.[13] As such, it has the exclusive power to legislate its "municipal affairs." (Cal. Const., art. XI, § 5; *Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 704 [209 Cal.Rptr. 682, 693 P.2d 261]; *R & A Vending Services, Inc.* v. *City of Los Angeles* (1985) 172 Cal.App.3d 1188, 1191-1192 [218 Cal.Rptr. 667].) ■ The City and Bailey assert that we should not reach the issue of whether the Board's outreach program violates Public Contract Code section 2000 because it is concerned solely with what is characterized as the "municipal affair" of competitive bidding, thereby insulating it from state regulation. We do not agree.

"[T]he charter represents the supreme law of the City, subject only to conflicting provisions in the federal and state Constitutions and to preemptive state law. [Citation.]" (*Domar I, supra,* 9 Cal.4th at p. 170.) The question of whether state law is preemptive turns on a determination of what constitutes a municipal affair. The Supreme Court has recognized that there is no exact definition of what constitutes a municipal affair. (*Committee of Seven Thousand* v. *Superior Court* (1988) 45 Cal.3d 491, 505 [247 Cal.Rptr. 362, 754 P.2d 708].) "In general, 'municipal action which affects persons outside of the municipality becomes to that extent a matter which the state is empowered to prohibit or regulate. . . .' [Citations.]" (*Ibid.*) The ultimate decision on the issue is necessarily based on an "ad hoc inquiry" into the facts and circumstances surrounding the individual situation. (*California Fed. Savings & Loan Assn.* v. *City of Los Angeles* (1991) 54 Cal.3d 1, 16 [283 Cal.Rptr. 569, 812 P.2d 916].)

The City and Bailey are correct that matters of competitive bidding are often found to involve solely municipal affairs. (See *R & A Vending Services, Inc.* v. *City of Los Angeles, supra,* 172 Cal.App.3d 1188, 1191-1192 [because the award of a contract for refreshment stands in a city park is a municipal affair, city had discretion to reject the highest bidder]; *Piledrivers' Local Union* v. *City of Santa Monica* (1984) 151 Cal.App.3d 509, 511-512 [198 Cal.Rptr. 731] [construction of a pier is a municipal affair, thereby excusing city from state statutory requirement of competitive bidding]; *Smith* v. *City*

---

[13]Cities organized under a charter are " 'chartered cities.' " (Gov. Code, § 34101.)

*of Riverside* (1973) 34 Cal.App.3d 529, 534 [110 Cal.Rptr. 67] [development of city-operated public utilities exempt from competitive bidding].) However, the instant situation does not fit into the mold which the City and Bailey assert has been created by the case law on which they rely.

In *City of Pasadena* v. *Charleville* (1932) 215 Cal. 384, 387 [10 P.2d 745], disapproved on other grounds in *Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566, 585 [79 Cal.Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194]), a city manager refused to approve a city-authorized contract for the construction of a fence around a municipal reservoir because it did not contain a provision forbidding the employment of aliens as required by the Public Works Alien Employment Act of 1931. The court recognized that the improvement required by the contract was solely a municipal affair. (215 Cal. at p. 389.) Nonetheless, it found that the statute forbidding the employment of aliens was "such an act of sovereignty as to constitute the subject thereof of general state concern as distinguished from a local or municipal affair." (*Id.* at p. 398.) Commenting that the wisdom of the act was subject to differing opinions, the *Charleville* court held that, because public works and public funds generally belong to all Californians, the Legislature could require that agencies throughout the state "discriminate in . . . favor" of citizens in awarding a contract that might otherwise involve only a "municipal affair." (*Id.* at p. 399.)

Discrimination on a statewide level—this time against women and minorities—is also the issue in Public Contract Code section 2000. In unchaptered sections of the bill in which section 2000 was enacted, the Legislature expressed its intention "to occupy the whole field of regulation of procedures for determining good faith efforts by bidders on public works contracts." (Stats. 1986, ch. 1060, § 4, p. 3723.) This was deemed necessary because "existing statutes requiring that contracts be let to the 'lowest responsible bidder' have prevented many local agencies from considering the responsiveness of a bidder to . . . minority or women business enterprise requirements." (*Id.,* § 3, p. 3723.) In addition, the Legislature found and declared "that the encouragement of, and participation by, minority and women business enterprises in public works contracts is a matter of statewide concern," and "that it is necessary to establish uniformity in determining whether or not bidders on public works contracts have made a good faith effort to meet the goals and requirements established by a local agency regarding participation in the contract by minority business enterprises and women business enterprises." (*Ibid.*)

Although a legislative finding that a particular subject is a matter of statewide concern does not necessarily make it so (*Bishop* v. *City of San Jose*

(1969) 1 Cal.3d 56, 63 [81 Cal.Rptr. 465, 460 P.2d 137]), it is well settled that courts should accord great weight to the Legislature's evaluation of this issue. (*Baggett* v. *Gates* (1982) 32 Cal.3d 128, 136 [185 Cal.Rptr. 232, 649 P.2d 874].) And where there is doubt as to whether a matter is truly a municipal affair, such doubt must be resolved in favor of the legislative authority of the state. (*Id.* at p. 140.)

Here, as in *Charleville*, many aspects of the contract for the Hyperion Secondary Sewage Treatment Plant project are doubtlessly matters which are concerned only with the City, and are therefore municipal affairs. However, the portion of the bid specification which set forth the criteria pursuant to which a prime contractor's outreach efforts to MBE, WBE, and other subcontractors are to be evaluated implicates the statewide policy of encouraging the participation in public works projects of groups which have historically had a low level of involvement. A uniform approach throughout the state is an important component of achieving this goal. Otherwise, prime contractors might find themselves engaged in the needlessly complex task of attempting to keep track of outreach programs with differing requirements, thereby potentially resulting in more "nonresponsive" bids and less competition for public contracts. Moreover, a uniform, statewide approach provides subcontractors with the benefit of knowing that they may expect to consistently be provided with the same opportunities and types of information on all public contracts in which they might be interested.

We have no reason to question the legitimacy of the Legislature's finding that Public Contract Code section 2000 involves a matter of statewide concern, or to reject the Legislature's declaration that the statute is intended to occupy the entire field with respect to MBE/WBE programs. (See *City of Pasadena* v. *Charleville*, *supra*, 215 Cal. 384.) Thus, to the extent that Public Contract Code section 2000 and the Board's outreach program are in conflict, the program must yield to the statute. (*California Fed. Savings & Loan Assn.* v. *City of Los Angeles*, *supra*, 54 Cal.3d at p. 16.) However, as explained below, we find that no such conflict exists.

b. *The outreach program does not violate Public Contract Code section 2000*

In subdivision (a)(1), Public Contract Code section 2000 permits a local agency to impose a condition in bid specifications that the bidder meet the

agency's goals and requirements for MBE and WBE subcontractor participation.[14] However, it further states that if these goals and requirements are not met, the bidder's good faith effort to achieve these goals will be evaluated pursuant to the 10 criteria set forth in subdivision (b). On the other hand, subdivision (a)(2) looks solely to the 10 criteria to determine whether the lowest-responsible-bidder requirement will be imposed. Since the outreach program under consideration here requires a showing of good faith as demonstrated by compliance with 10 criteria that parallel those in subdivision (b), it complies with the provisions of subdivision (a)(2).

■ Focusing on the "either/or" phrasing of subdivision (a), Domar contends that the Board's outreach program violates Public Contract Code section 2000 because it encompasses only the type of program described in subdivision (a)(2), to the exclusion of the type of program described in subdivision (a)(1). Based on the failure to provide a subdivision (a)(1) option, Domar claims that it was deprived of the opportunity to demand that its bid be accepted on the basis that it met the Board's stated goal of 1 percent MBE/WBE subcontractor participation. Domar misreads both section 2000 and the requirements of the Board's outreach program.

Before the passage of Public Contract Code section 2000, judicial interpretation of the statutory requirement that all contracts be let to the lowest responsible bidder raised doubts about the constitutionality of programs designed to promote MBE and WBE participation in public contracts. Section 2000 was enacted in 1986 for the precise purpose of eliminating those doubts by creating exceptions to the requirement. Moreover, at the time of enactment, *Richmond* v. *J. A. Croson Co.*, *supra*, 488 U.S. 469, had not been decided, and MBE/WBE programs with bid preferences, quotas and set-asides were common.[15]

Given the circumstances surrounding the creation of Public Contract Code section 2000, it is clear that the Legislature envisioned two types of programs—one whose goals and requirements could be met either by achieving

---

[14]For convenience, we again set forth pertinent provisions of section 2000: "(a) Notwithstanding any other provision of law requiring a local agency to award contracts to the lowest responsible bidder, any local agency may require that a contract be awarded to the lowest responsible bidder who also does either of the following: [¶] (1) Meets goals and requirements established by the local agency relating to participation in the contract by minority business enterprises and women business enterprises. If the bidder does not meet the goals and requirements established by the local agency for that participation, the local agency shall evaluate the good faith effort of the bidder to comply with those goals and requirements as provided in paragraph (2). [¶] (2) Makes a good faith effort, in accordance with the criteria established pursuant to subdivision (b), prior to the time bids are opened, to comply with the goals and requirements established by the local agency relating to participation in the contract by minority or women business enterprises."

[15]As noted in *Domar I*, programs with fixed numbers may still be valid under *Croson* if they are based on direct evidence of past discrimination. (9 Cal.4th at p. 166.)

a set number, percentage, or quota of MBE/WBE participation or demonstrating the good faith (but unsuccessful) effort which had been undertaken to encourage such participation (subd. (a)(1)), and one whose goals and requirements involved only the making of a good faith outreach effort, irrespective of the attainment of the stated goal (subd. (a)(2)).[16] When *Croson* became the law of the land several years later, entities such as the City and the Board which had not empirically demonstrated past discrimination against MBE's and WBE's were unable to implement MBE/WBE programs under subdivision (a)(1) without running afoul of the equal protection clause as interpreted in *Croson*. For these entities, subdivision (a)(2) programs are the only option at the present time.[17]

Domar's achievement of the 1 percent goal for MBE/WBE participation is irrelevant to Public Contract Code section 2000. Even if a subdivision (a)(1) program had been constitutionally available, the City could have still elected to fashion its MBE/WBE outreach efforts based solely on subdivision (a)(2). As such, and even given the inclusion of the now-repudiated factor of an estimated level of MBE/WBE participation, the achievement of that goal level would not require a finding that an adequate outreach effort had been made. Indeed, the purpose of the subdivision (a)(2) program implemented by the Board is to promote a certain quantity and quality of outreach, regardless of its ultimate result. (See *Domar I*, *supra*, 9 Cal.4th at pp. 167-168.)

The choice between a program based on Public Contract Code section 2000, subdivision (a)(1) and one based on subdivision (a)(2) is to be made by the local agency, not the bidder. In light of *Croson*, the only MBE/WBE programs that are constitutionally available to the City and the Board are those modeled after subdivision (a)(2). That the Board ultimately created such a program in no way violates the "either/or" language of subdivision (a).

---

[16]Relying on a provision in an August 14, 1986, Senate Amendment to Assembly Bill No. 1464 which stated that "preference" or "set-aside" programs would be exempt from Public Contract Code section 2000, Domar argues that subdivision (a)(1) necessarily contemplated something other than the numerical goals that are associated with such programs. However, Domar has presented no history or analysis of this provision, which was deleted by amendment on August 28, 1986. The amendment to Assembly Bill No. 1464 which added Public Contract Code section 2000 was included in an amendment of May 16, 1985. The bill was passed by the Legislature over a year later, on August 29, 1986. (Assem. Final Hist. (1985-1986 Reg. Sess.) p. 1021.) The two-week Senate lifespan of the provision on which Domar relies is not helpful to this court.

[17]Domar does not contend that subdivision (a)(1) may not be severed from the remainder of section 2000, nor could it successfully do so. To the extent that subdivision (a)(1) may be unconstitutional as applied, it is severable mechanically and grammatically, functionally, and volitionally (i.e., the statute would have been adopted without subdivision (a)(1) had its unconstitutionality been foreseen). (See *Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 821-822 [258 Cal.Rptr. 161, 771 P.2d 1247]; *People's Advocate, Inc. v. Superior Court* (1986) 181 Cal.App.3d 316, 330-333 [226 Cal.Rptr. 640].)

## 2. *The Equal Protection Clause and Croson*

█ Relying on *Richmond* v. *J. A. Croson Co.*, *supra*, 488 U.S. 469, Domar contends that, on its face, the Board's outreach program violates the equal protection clause of the Fourteenth Amendment to the United States Constitution by discriminating in favor of MBE/WBE subcontractors and against OBE's. This contention is also lacking in merit.

As explained in *Croson*, the Richmond City Council adopted an MBE plan in 1983 which required prime contractors on city projects to subcontract at least 30 percent of the dollar amount of the contract to MBE's unless the contractor could show that every conceivable attempt had been made to do so but that qualified MBE's were either unavailable or unwilling to participate. (488 U.S. at pp. 477-479 [102 L.Ed.2d at pp. 871-873].) The plan was adopted following public hearings that included the presentation of data which demonstrated a large disparity between the percentage of minorities in Richmond's general population and the percentage of minorities who participated in city contracts. The city's legal counsel advised that the plan was constitutional under *Fullilove* v. *Klutznick* (1980) 448 U.S. 448 [65 L.Ed.2d 902, 100 S.Ct. 2758], in which the Supreme Court had held that a congressional program requiring that 10 percent of federal construction grants be awarded to minority contractors did not violate the equal protection clause. (*Richmond* v. *J. A. Croson Co.*, 488 U.S. at p. 480 [102 L.Ed.2d at p. 873].)

Noting that the hearings had not produced any "direct evidence of race discrimination on the part of the city in letting contracts or any evidence that the city's prime contractors had discriminated against minority-owned subcontractors" (488 U.S. at p. 480 [102 L.Ed.2d at p. 873]), the *Croson* court concluded that "an amorphous claim that there has been past discrimination in a particular industry cannot justify the use of an unyielding racial quota." (*Id.* at p. 499 [102 L.Ed.2d at p. 885].) Rather, the adoption of a set-aside plan requires "a 'strong basis in evidence . . . that remedial action was necessary.' [Citation.]" (*Id.* at p. 500 [102 L.Ed.2d at p. 886].) The failure of Richmond's MBE plan to define both the scope of the injury and the extent of the remedy necessary to cure its effects thus violated the equal protection clause of the Fourteenth Amendment. (*Id.* at pp. 510-511 [102 L.Ed.2d at pp. 892-893] (plur. opn. by O'Connor, J.).)[18]

We find that executive directive No. 1-C accomplished exactly what it intended—to provide the framework for the creation of outreach programs

---

[18]Prior to *Croson*, the Ninth Circuit had disapproved an affirmative action program which similarly lacked specific findings of past discrimination. (*Assoc. Gen. Contr. of Cal., Inc.* v. *City & County of S.F.* (9th Cir. 1987) 813 F.2d 922.) Following *Croson*, in *Associated Gen. Contractors of Cal.* v. *Coalition* (9th Cir. 1991) 950 F.2d 1401, 1412-1418, the Ninth Circuit rejected a challenge to the denial of a preliminary injunction that was requested against a San Francisco MBE/WBE program, finding a likelihood that the program would be upheld

that would maximize participation by all subcontractors, including MBE's and WBE's, in light of the absence of empirical data by which the City could precisely define the scope of past discrimination against minorities and women and the extent to which remedial action would be necessary. Unlike the Richmond plan's "unyielding racial quota" and "rigid racial preferences" in *Croson*, the Board's outreach program seeks no more than to ensure that the playing field is level for all subcontractors. As such, it is race- and gender-neutral.

Based on the outreach program's reference to an expected level of 1 percent MBE/WBE participation, Domar claims that the program is in fact a race- and gender-conscious program masquerading as one that is not. Domar misperceives the nature of the outreach program. The stated number of 1 percent MBE/WBE participation is not a preference, quota, or set-aside. Rather, it is merely an indication of the level of MBE/WBE subcontractor participation that might be expected if the efforts specified in criteria Nos. 2 through 10 of the outreach program were made in good faith by prime contractors who are bidding on a project.[19] The lack of significance of the 1 percent figure is demonstrated by the fact that it would not even have been part of the bidder's checklist had the bid package been prepared in conformity with the mayor's June 5, 1991 letter (which eliminated the numerical factor from consideration in determining the extent of a bidder's good faith outreach efforts).

Domar claims that inclusion of OBE's provides further evidence that the Board's outreach program is not actually race- and gender-neutral. Not so.

MBE's, WBE's and OBE's make up the entire universe of subcontractors who might bid on a public works project. "[T]he purposes of competitive bidding . . . are 'to guard against favoritism, improvidence, extravagance, fraud and corruption. . . .' [Citation.]" (*Domar I, supra*, 9 Cal.4th at p. 173.) Perhaps its most important goal "is to protect against 'insufficient competition to assure that the government gets the most work for the least money.' [Citation.] Mandatory set-asides and bid preferences work against this goal by narrowing the range of acceptable bidders solely on the basis of their particular class. In stark contrast, requiring prime contractors to reach out to all types of subcontracting enterprises broadens the pool of participants in the bid process, thereby guarding against the possibility of insufficient competition." (*Id.* at p. 177.)

---

because the board of supervisors had been presented with direct evidence of past discrimination, and had narrowly tailored the program to redress the consequences of that discrimination.

[19]As noted in *Domar I, supra*, 9 Cal.4th at page 177, there are "significant differences between . . . set-asides, bid preferences and contracting goals . . . and the good faith outreach required here."

It is true that the focus of an equal protection analysis must be on the economic realities of a program rather than its label. (*Bras* v. *California Public Utilities Com'n* (9th Cir. 1995) 59 F.3d 869, 875 [although public utilities not compelled to adopt programs with quotas or set-asides, the practical effect of statutes and orders required that they do so].) But criteria Nos. 2 through 10 of the Board's outreach program do nothing more than provide guidelines for how to maximize the number of subcontractors from whom a prime contractor may select, be they MBE's, WBE's or OBE's.[20] The outreach program does not require that certain categories of subcontractors be the beneficiaries of a prime contractor's outreach efforts, nor does it require that certain categories of subcontractors be granted any type of preference. As such, it does not violate the equal protection clause of the Fourteenth Amendment to the United States Constitution.

### DISPOSITION

The judgment is affirmed.

Spencer, P. J., and Ortega, J., concurred.

On January 25, 1996, the opinion was modified to read as printed above.

---

[20]The only actual reference to MBE's or WBE's in factors Nos. 2 through 10 of the guidelines is the requirement in factor No. 4 of advertising in "one or more daily or weekly newspapers, trade association publications, *minority* or trade oriented publications, trade journals, or other media specified by the Board." (Italics added.)