TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

XAVIER BECERRA
Attorney General

_____

|  |  |  |
|---|---|---|
| OPINION | : | No. 16-603 |
| of | : | July 11, 2017 |
| XAVIER BECERRA<br>Attorney General | : | |
| LAWRENCE M. DANIELS<br>Deputy Attorney General | : | |

_____

THE HONORABLE CHRIS R. HOLDEN, MEMBER OF THE STATE ASSEMBLY, has requested an opinion on the following question:

Does the California Voter Participation Rights Act apply to charter cities, and to local school districts whose elections are governed by city charters?

CONCLUSION

The California Voter Participation Rights Act applies to charter cities, and to local school districts whose elections are governed by city charters.

ANALYSIS

California holds statewide elections in June and November of every even-numbered year.[1] Local elections held on the statewide election dates are referred to as "consolidated," "concurrent," or "on-cycle," whereas those held on other dates are described as "nonconcurrent" or "off-cycle."[2] In 2015, faced with the problem of substantially lower voter turnout in off-cycle elections, the Legislature enacted the California Voter Participation Rights Act ("Act").[3]

The Act, which becomes operative on January 1, 2018,[4] requires any "political subdivision" whose elections have a "significant decrease in voter turnout" to hold its elections on a statewide election date.[5] The Act defines "political subdivision" as "a geographic area of representation created for the provision of government services, including, but not limited to, a city, a school district, a community college district, or other district organized pursuant to state law."[6] A "[s]ignificant decrease in voter turnout" occurs where "the voter turnout for a regularly scheduled election in a political subdivision is at least 25 percent less than the average voter turnout within that political subdivision for the previous four statewide general elections."[7] And "voter turnout" is "the percentage of voters who are eligible to cast ballots within a given political subdivision who voted."[8] The question presented is whether charter cities (and school

---

[1] Elec. Code, § 1001; see Elec. Code, §§ 1200 ("The statewide general election shall be held on the first Tuesday after the first Monday in November of each even-numbered year"), 1201 ("The statewide direct primary shall be held on the first Tuesday after the first Monday in June of each even-numbered year").

[2] Elec. Code, §§ 10403, 14052, 14053; Cal. Common Cause, Getting to 100%: How Changing the Election Date Can Improve Voter Turnout (Feb. 2015) p. 3.

[3] Stats. 2015, ch. 235, § 1, eff. Jan. 1, 2016, operative Jan. 1, 2018 (adding Elec. Code, div. 14, ch. 1.7, §§ 14050-14057); see Berry & Gersen, *The Timing of Elections* (Winter 2010) 77 U of Chi.L.Rev 37, 55 & fn. 66 (in California, "[o]ff-cycle elections generate systematically lower turnout").

[4] Elec. Code, § 14057.

[5] Elec. Code, § 14052, subd. (a); see also Elec. Code, § 14052, subd. (b) ("A political subdivision may hold an election other than on a statewide election date if, by January 1, 2018, the political subdivision has adopted a plan to consolidate a future election with a statewide election not later than the November 8, 2022, statewide general election").

[6] Elec. Code, § 14051, subd. (a).

[7] Elec. Code, § 14051, subd. (b).

[8] Elec. Code, § 14051, subd. (c).

2

districts whose elections are governed by those charters[9]), by virtue of the California Constitution's "home-rule" provision, need not comply with the Act, or whether charter city law must yield to the Act where the two conflict. For the reasons that follow, we conclude that under such circumstances the Act controls.

We begin our analysis with the law on charter city autonomy. The California Constitution, article XI, section 5 gives charter cities the power to legislate "in respect to municipal affairs" over inconsistent state law.[10] These municipal affairs include the "conduct of city elections" and "the times at which . . . the several municipal officers . . . whose compensation is paid by the city shall be elected . . . ."[11] But a charter city's "home-rule" authority over municipal affairs is not absolute; state law may trump charter law on matters of "statewide concern."[12]

The California Supreme Court has set forth a four-part test to determine when a state statute preempts a charter city law.[13] Under this test, a court must determine: (1) whether the charter city law regulates a municipal affair; (2) whether there is an actual conflict between the charter city law and the state statute; (3) whether the state statute addresses a matter of statewide concern; and (4) whether the state statute "is reasonably related to resolution of that concern and narrowly tailored to avoid unnecessary interference in local governance."[14] "If the court is persuaded that the subject of the state statute is one of statewide concern and that the statute is reasonably related to its resolution [and not unduly broad in its sweep], then the conflicting charter city measure ceases to be a 'municipal affair' pro tanto and the Legislature is not prohibited by article XI, section 5(a), from addressing the statewide dimension by its own tailored enactments."[15]

---

[9] Like charter cities, school districts within charter cities whose charters govern their elections are normally exempt from the requirement that local elections be held on one of four "established election dates," which include the statewide election dates. (Elec. Code, §§ 1000, 1002, 1003, subds. (b), (d).)

[10] Cal. Const., art. XI, § 5, subd. (a).

[11] Cal. Const., art. XI, § 5, subd. (b)(3), (b)(4); see also Cal. Const., art. IX, § 16, subd. (a) (city charter may regulate school board elections).

[12] *State Bldg. and Const. Trades Council of Cal., AFL-CIO v. City of Vista* (2012) 54 Cal.4th 547, 552, 555-556 (*Vista*).

[13] *Vista, supra*, 54 Cal.4th at p. 556; *Cal. Fed. Savings & Loan Assn. v. City of Los Angeles* (1991) 54 Cal.3d 1, 16-17 (*Cal. Fed.*).

[14] *Vista, supra*, 54 Cal.4th at p. 556, internal quotation marks, internal citations, and ellipses omitted.

[15] *Vista, supra*, 54 Cal.4th at p. 556, internal quotation marks and ellipses omitted.

In *Jauregui v. City of Palmdale*, the Court of Appeal utilized this preemption test in a case concerning the California Voting Rights Act of 2001 (CVRA).[16] The CVRA sought to remedy minority vote dilution—a different voting-rights problem than the one that the Act addresses, i.e., low voter turnout in off-cycle elections. As explained in *Jauregui*, the CVRA was "adopted to prevent an at-large electoral system from diluting minority voting power and thereby impairing a protected class from influencing the outcome of an election."[17] At issue in *Jauregui* was whether the CVRA applied to charter cities.[18]

Using the California Supreme Court's preemption test from *Vista*, the Court of Appeal in *Jauregui* first determined that a charter city's selection of at-large elections over district-based elections was a "municipal affair" because "article XI, section 5, subdivision (b) expressly identifies the conduct of city elections as a municipal affair."[19] Second, the court found that there was an "actual conflict" between the CVRA and the city charter provision upon finding vote dilution of a protected class.[20] Third, the court explained that the CVRA involved a statewide concern as it implicated the constitutional rights to vote and equal protection as well as electoral integrity.[21] Finally, the court reasoned that the CVRA was narrowly drawn and reasonably related to the resolution of these statewide concerns since the CVRA only applied to at-large council elections when there has been vote dilution of a protected class.[22] Based on its analysis, the Court of Appeal concluded that the "home-rule" provisions of article XI, section 5 did not prevent the CVRA from being enforced in charter cities.[23] The Court of Appeal's analysis now informs our own as we apply this same preemption test to the Act.

First, we also find the Act regulates a municipal affair—the decision when to hold a local election. The state Constitution enumerates the "conduct of city elections" and "the times at which . . . the several municipal officers . . . shall be elected" as two

---

[16] *Jauregui v. City of Palmdale* (2014) 226 Cal.App.4th 781, 795-802 (*Jauregui*); see Stats. 2002, ch. 129, § 1; Elec. Code, §§ 14025-14032.

[17] *Jauregui*, *supra*, 226 Cal.App.4th at p. 789.

[18] *Jauregui*, *supra*, 226 Cal.App.4th at p. 788.

[19] *Jauregui*, *supra*, 226 Cal.App.4th at p. 796, citing *Johnson v. Bradley* (1992) 4 Cal.4th 389, 398 (*Johnson*).

[20] *Jauregui*, *supra*, 226 Cal.App.4th at pp. 796-798.

[21] *Jauregui*, *supra*, 226 Cal.App.4th at pp. 798-801.

[22] *Jauregui*, *supra*, 226 Cal.App.4th at p. 802.

[23] *Jauregui*, *supra*, 226 Cal.App.4th at p. 802.

categories of municipal affairs.[24]  A charter city's decision to hold a local election on a date other than a statewide election date involves the conduct of city elections and may also involve the times at which municipal officers are elected.

Second, an actual conflict exists between state and charter city law.  As a threshold matter, we find that the Legislature intended the Act to apply to charter cities and school districts.  The Act specifically includes "a city" and "a school district" under the definition of "political subdivision."[25]  A charter city is a city.[26]  Moreover, a charter city and a school district fall within the definition of "political subdivision" under the Act, as each is "a geographic area of representation created for the provision of government services . . . ."[27]  The Court of Appeal in *Jauregui* applied the CVRA's identical definition of "political subdivision" to charter cities,[28] and we presume that the Legislature enacted the same language in the Act in light of this judicial ruling.[29]  The presumption is bolstered here by the author's statements during legislative hearings that the bill covered charter cities.[30]  Under this interpretation, the Act actually conflicts with

[24] Cal. Const., art. XI, § 5, subds. (b)(3), (b)(4); see *Johnson*, *supra*, 4 Cal.4th at p. 398; *Jauregui*, *supra*, 226 Cal.App.4th at p. 796.

[25] Elec. Code, § 14051, subd. (a) ("'Political subdivision' means a geographic area of representation created for the provision of government services, including, but not limited to, a city, a school district, a community college district, or other district organized pursuant to state law"); see Elec. Code, § 14052, subd. (a) ("a political subdivision shall not hold an election other than on a statewide election date if holding an election on a nonconcurrent date has previously resulted in a significant decrease in voter turnout").

[26] Gov. Code, §§ 34100, 34101; *Jauregui*, *supra*, 226 Cal.App.4th at p. 794 ("The Legislature recognizes two types of cities.  The first kind, a municipality organized under a charter, is a charter city").

[27] Elec. Code, § 14051, subd. (a); see Cal. Const., art. IX, § 14, art. XI, §§ 5, 7, 9; Ed. Code, §§ 1040, 1042, 1240, 35160, 35160.1, 35160.2.

[28] *Jauregui*, *supra*, 226 Cal.App.4th at pp. 796-798; see former Elec. Code, § 14026, subd. (c), as enacted by Stats. 2002, ch. 129, § 1.  In 2015, the Legislature codified *Jauregui*'s holding by expressly including "charter city" in the definition of "political subdivision" in the CVRA.  (Stats. 2015, ch. 724, § 2; Assem. Com. on Elections and Redistricting, Analysis of Assem. Bill No. 277 (2015-2016 Reg. Sess.) as introduced Feb. 11, 2015, p. 8.)

[29] *People v. Harrison* (1989) 48 Cal.3d 321, 329 ("Where a statute is framed in language of an earlier enactment on the same or an analogous subject, and that enactment has been judicially construed, the Legislature is presumed to have adopted that construction").

[30] Assem. Standing Com. on Elections and Redistricting, Hearing (Jul. 1, 2015),

charter city law where the charter city's off-cycle elections result in a significant decrease in voter turnout. Specifically, charter city law allows off-cycle elections, yet the Act prohibits them.[31] When this happens, the conflict "is in fact a genuine one, unresolvable short of choosing between one enactment and the other."[32]

Third, the Act addresses a matter of statewide concern: low voter turnout in off-cycle elections. To determine whether a statewide concern is present, we consider whether there is a "a convincing basis for legislative action originating in extramunicipal concerns, one justifying legislative supersession based on sensible, pragmatic considerations."[33] In doing so, we must "avoid the error of 'compartmentalization,' that is, of cordoning off an entire area of governmental activity as either a 'municipal affair' or one of statewide concern."[34] A finding of statewide concern does not mean that the charter city law is not of municipal concern, but "rather, that under the historical circumstances presented, the state has a more substantial interest in the subject than the charter city."[35]

---

testimony of Sen. Ben Hueso, available at https://ca.digitaldemocracy.org/hearing/383?startTime=114&vid=G-cKeAHj51U, at 2:00, 3:29 (where the bill's author states that the Act applies to charter cities, which, according to his research, does not violate the state Constitution); see *Walters v. Weed* (1988) 45 Cal.3d 1, 10-11 (the "almost irresistible" presumption that the Legislature used language in the same sense as it was judicially construed in another statute "is strengthened further by the author's statements at the committee hearing" supporting this construction).

[31] Elec. Code, §§ 14051, subd. (b), 14052, subd. (a).

[32] *Cal. Fed.*, *supra*, 54 Cal.3d at pp. 16-17. While the Act and charter city law are not "entirely at odds" because a charter city may still hold off-cycle elections if there is no significant decrease in voter turnout (*Jauregui*, *supra*, 226 Cal.App.4th at p. 797), for an actual conflict to be present, "a local enactment may only contravene some aspects of a state law or do so only to an extent" (*id.* at p. 798, citing *Domar Electric, Inc. v. City of Los Angeles* (1995) 41 Cal.App.4th 810, 822). In *Jauregui*, there was an actual conflict even though the CVRA "does not prohibit city-wide council elections" but only does so if the charter city's "at-large electoral system" results in "a dilution of a protected class's voting rights . . . ." (*Jauregui*, *supra*, 226 Cal.App.4th at p. 798.) Likewise, there is an actual conflict whenever the charter city's off-cycle elections meet the statutory standard of a significant decrease in voter turnout.

[33] *Cal. Fed.*, *supra*, 54 Cal.3d at p. 18.

[34] *Cal. Fed.*, *supra*, 54 Cal.3d at p. 17.

[35] *Cal. Fed.*, *supra*, 54 Cal.3d at p. 18.

6

California's off-cycle elections generally have a substantially lower voter turnout than its on-cycle elections.[36]  According to one report—cited in the legislative history about California mayoral and councilmanic elections—"simply moving an election to be synchronized with the even year state elections can result in a 21-36 percent boost in voter turnout for municipal and other local elections."[37]  Some commentators maintain that off-cycle elections often have low voter turnout "because they are formally nonpartisan and deliberately timed not to coincide with other elections, when the public's attention is at its peak."[38]  The Act's purpose, according to the bill's author, was to combat the "abysmal" voter turnout in certain off-cycle elections by holding them "concurrently with statewide and federal elections, where voter turnout is often twice as high."[39]  Given these historical circumstances, we believe that the state has a more substantial interest in tackling the problem of low voter turnout in off-cycle elections than a charter city has in setting off-cycle dates for its local elections.[40]  Here, as in *Jauregui*, there are grounds for finding a matter of statewide concern—the constitutional right to vote and the integrity of the electoral process.[41]

---

[36] Berry & Gerson, *supra*, 77 U of Chi.L.Rev at p. 55 & fn. 66.

[37] Sen. Rules Com., Off. of Sen. Floor Analyses, Unfinished Business Analysis of Sen. Bill 415 (2015-2016 Reg. Sess.) as amended Jun. 23, 2015, p. 11; see Hajnal, Lewis, & Louch, Public Policy Institute of Cal., *Municipal Elections in Cal.:  Turnout, Timing and Competition* (2002) pp. 35-37.

[38] Raam, *Charter School Jurisprudence and the Democratic Ideal* (Fall 2016) 50 Colum. J.L. & Soc. Probs. 1, 23, internal quotation marks omitted; see Cal. Const., art. II, § 6, subd. (a) (all school and city offices must be nonpartisan).

[39] Sen. 3d reading analysis of Sen. Bill 415 (2015-2016 Reg. Sess.) as amended Jun. 23, 2015, p. 3.

[40] It is claimed that charter cities have a "categorical" supremacy over city-officer elections based on their constitutionally granted "plenary authority" in these matters. (See Cal. Const., art. XI, § 5, subd. (b)(4).)  We are particularly directed to *Mackey v. Thiel* (1968) 262 Cal.App.2d 362, where the Court of Appeal ruled that a state statute mandating that the city clerk mail qualification pamphlets upon a candidate's request must give way to the charter city's refusal to do so.  (*Id.* at pp. 363-366.)  In reaching its decision, the appellate court determined that the statute at issue was not of statewide concern as it did not "involve[] the right to vote."  (*Id.* at pp. 365-366.)  The court's own rationale therefore refutes the idea that a charter city's sovereignty over city elections is absolute.  (See also *Jauregui*, *supra*, 226 Cal.App.4th at pp. 803-804 ["The plenary authority identified in article XI, section 5, subdivision (b) can be preempted by a statewide law after engaging in the four-step evaluation process specified by our Supreme Court"].)

[41] See *Jauregui*, *supra*, 226 Cal.App.4th at pp. 799-801, citing U.S. Const., 14th

As the *Jauregui* court observed, "[t]he right to vote is fundamental" and the federal and state Constitutions protect it.[42] The California Constitution devotes several sections to this right, providing that "[a]ll political power is inherent in the people,"[43] that any United States citizen and resident at least 18 years old may vote,[44] that every vote must count and be secret,[45] and that the Legislature is responsible for providing "free elections."[46]

As at-large elections may impinge on voting by causing voter dilution, off-cycle elections may impinge on voting by causing low voter turnout. The state's interest in facilitating the exercise of the people's right of suffrage "is one that goes to the legitimacy of the electoral process" and arises not "*merely* from a municipal concern."[47]

Amend. & Cal. Const., art. I, § 7, subd. (a), art. II, § 2. An isolated comment in the legislative record also raises possible *equal protection* concerns from low voter turnout in off-cycle elections. The bill's author stated, "As a result of low voter turnout, the voting population often does not look like the general public as a whole and neither does the city council." (Sen. Com. on Elec. & Const. Amends., analysis of Sen. Bill 415 (2015-2016 Reg. Sess.) as amended Apr. 15, 2015, p. 4.) It may be, as some advocates argue, that off-cycle elections disproportionately affect the voting of certain racial groups. (See, e.g., Burns, *New Law Might Mess With Odd-Year District Elections*, Santa Barbara Independent (Sep. 17, 2015), available at http://www.independent.com/news/2015/sep/17/new-law-might-mess-odd-year-district-elections/; Cal. Common Cause, *supra,* at p. 2 & fn. 6; see also *U.S. v. Village of Port Chester* (S.D.N.Y. 2010) 704 F.Supp.2d 411, 444 [in a federal Voting Rights Act action, finding that "off-cycle and staggered Trustee elections contribute to the Hispanic community's difficulty in electing its candidates of choice and 'enhance the opportunity for discrimination against Hispanics'"].) At any rate, we need not reach this issue given our other bases for finding low voter turnout to be a matter of statewide concern.

[42] *Jauregui*, *supra*, 226 Cal.App.4th at pp. 799-800; see *Yick Wo v. Hopkins* (1886) 118 U.S. 356, 370 (the right to vote is "a fundamental political right, because preservative of all rights"); *Cawdrey v. City of Redondo Beach* (1993) 15 Cal.App.4th 1212, 1226 (recognizing "the fundamental right to vote" as "obviously" a matter of statewide concern).

[43] Cal. Const., art. II, § 1.

[44] Cal. Const., art. II, § 2.

[45] Cal. Const., art. II, § 2.5, 7.

[46] Cal. Const., art. II, § 3.

[47] *Jauregui*, *supra*, 226 Cal.App.4th at p. 800; see *O'Callaghan v. State* (Alaska 1996) 914 P.2d 1250, 1263 ("The State's interests in encouraging voter turnout . . . are important and are legitimate objectives for a state to seek to achieve when structuring

8

Moreover, significantly lower voter turnout in off-cycle elections affects electoral integrity. The California Supreme Court has instructed that "the integrity of the electoral process, at both the state and local level, is undoubtedly a statewide concern."[48] In *Jauregui*, in concluding that the California Voting Rights Act governed a matter of statewide concern, the Court of Appeal reasoned, "Electoral results lack integrity where a protected class is denied equal participation in the electoral process because of vote dilution."[49] One meaning of "integrity" is the "[s]tate or quality of being complete, undivided, or unbroken; entirety; as the *integrity* of an empire."[50] Elections are less "complete" when there is significantly lower voter turnout because fewer eligible voters are participating in the electoral process.[51] This turnout therefore undermines electoral integrity and thus involves a matter of statewide concern.[52] This concern potentially

---

election procedures"); see also Assem. Standing Com. on Elections and Redistricting, Hearing (Jul. 1, 2015), testimony of Sen. Ben Hueso, available at https://ca.digitaldemocracy.org/hearing/383?startTime=114&vid=G-cKeAHj51U, at 11:27 (the bill is "trying to create a situation in which you're making it easier for people to weigh in to decisions that affect their lives in a big way").

[48] *Johnson*, *supra*, 4 Cal.4th at p. 409, citing 35 Ops.Cal.Atty.Gen. 230, 231-232 (1960) (concluding that a state statute requiring that candidates comply with campaign financial disclosure laws governed a matter of statewide concern because it was "aimed at obtaining the election of persons free from domination by self-seeking individuals or pressure groups").

[49] *Jauregui*, *supra*, 226 Cal.App.4th at p. 801.

[50] Webster's New Internat. Dict. (2d ed. 1961) p. 1290, col. 3; see also Random House Webster's Unabridged Dict. (2d ed. 1997) p. 990, col. 2 (defining integrity as "the state of being whole, entire, or undiminished"); Merriam-Webster online, at https://www.merriam-webster.com/dictionary/integrity (defining integrity as "the quality or state of being complete or undivided").

[51] In other contexts, too, integrity has been construed to include completeness. (E.g., *People v. Santana* (2013) 56 Cal.4th 999, 1004 [interpreting our mayhem statute]; *State v. Pratt* (Neb. 2014) 842 N.W.2d 800, 810-811 [interpreting Nebraska's DNA testing statute]; *Garelli Wong & Associates, Inc. v. Nichols* (N.D. Ill. 2008) 551 F.Supp.2d 704, 709 [interpreting the federal Computer Fraud and Abuse Act].)

[52] Analogously, in 2013, the Legislature amended other statutes to require that certain elections on city charters occur only on established statewide general election dates. (Stats. 2013, ch. 184, § 2; Elec. Code, §§ 1415, 9255, 9260; Gov. Code, §§ 34457, 34458.) The bill's purpose was to increase voter participation for these elections. (Assem. Com. on Elections and Redistricting, Analysis of Sen. Bill No. 311 (2013-2014 Reg. Sess.) as amended Jun. 18, 2013, pp. 3-7.) Similarly, two years earlier, the Legislature had circumscribed the dates of these elections to a lesser degree to secure

9

arises in all off-cycle local elections, including those held in charter cities. In light of the statewide concerns about voter participation in off-cycle elections, we readily conclude that the Act does not solely address municipal matters.[53]

Finally, we find the Act to be reasonably related to the resolution of the statewide concerns discussed above. As mentioned, election studies support the Legislature's determination that consolidating low-turnout off-cycle elections with statewide elections would increase voter participation in local elections.[54] The Act is also narrowly tailored to avoid unnecessary interference in local governance. It applies only when the locality has a quantifiably (at least a 25%) lower voter turnout in its regularly scheduled elections than in its statewide general elections.[55] So it does not affect charter cities whose off-cycle elections do not manifest this difference in voter turnout.[56]

While a charter city's constitutional sovereignty over its municipal affairs should not be minimized, it must at times yield to statewide concerns. When off-cycle elections result in significantly decreased voter participation, they compromise "the essence of a democratic form of government,"[57] raising an important matter of statewide concern. For

---

"broader voter participation." (*Id.* at p. 6.) In so doing, the Legislature acted "to ensure the statewide integrity of local government," thereby addressing "an issue of statewide concern." (Stats. 2011, ch. 692, § 10.)

[53] See also *Cal. Fed.*, *supra*, 54 Cal.3d at p. 24 (any doubt as to whether a matter is solely a municipal concern "must be resolved in favor of the legislative authority of the state," internal quotation marks omitted).

[54] It is argued that consolidating off-cycle elections with statewide elections is counterproductive because voters often pay less or no attention to local elections near the end of lengthy ballots as a result of "choice fatigue." During the legislative process, opposing positions on this issue were presented to the Legislature. (Compare Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill 415 (2015-2016 Reg. Sess.) as amended Apr. 28, 2015, pp. 5-6 ["Voter fatigue would likely counteract any benefit of forcing such a change as Agency elections would fall toward the end of a crowded ballot"] with *id.* at p. 5 ["Elections held on the same date can help reduce voter fatigue and make voting more habit forming"].) We need not enter into this policy debate, which the Legislature apparently resolved, to decide that the Act reasonably addressed the structural problem of low voter turnout in off-cycle elections.

[55] Elec. Code, §§ 14051, subd. (b), 14052, subd. (a).

[56] Cf. *Jauregui*, *supra*, 226 Cal.App.4th at p. 802 (finding the CVRA was narrowly tailored because it permits "citizens to challenge city-wide elections and, *only if there is vote dilution*, permit[s] a court to impose reasonable remedies to alleviate the problem").

[57] *Jauregui*, *supra*, 226 Cal.App.4th at p. 800.

16-603

these reasons, we conclude that the California Voter Participation Rights Act applies to charter cities, and to local school districts whose elections are governed by city charters.

*****