Filed: 5/28/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| JUAN JAUREGUI et al., | B251793 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BC483039) |
| v. | |
| CITY OF PALMDALE, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Mark V. Mooney, Judge.  Affirmed.

Matthew Ditzhazy, Palmdale City Attorney, Noel Doran, Assistant City Attorney; Nielsen Merksamer Parrinello Gross & Leoni, Marguerite M. Leoni and Christopher Skinnell; and Richards, Watson & Gershon, Mitchell E. Abbott and Aaron C. O'Dell for Defendant and Appellant.

Goldstein, Borgen, Dardarian & Ho, Morris J. Baller, Laura L. Ho and Katrina L. Eiland; Law Office of Robert Rubin, Robert Rubin and Milton C. Grimes; Shenkman & Hughes, Kevin I. Shenkman, Mary P. Hughes and John L. Jones II; and R. Rex Parris Law Firm, R. Rex Parris and Brendan Gilbert for Plaintiffs and Respondents.

# I.  INTRODUCTION

Defendant, City of Palmdale, California, appeals from a September 30, 2013 preliminary injunction secured by plaintiffs, Juan Juaregui, Nigel Holly and V. Jesse Smith.  The preliminary injunction, among other things, enjoins defendant from certifying the results of an at-large city council election which was ultimately held on November 5, 2013.  Plaintiffs' sole cause of action is for a violation of the California Voting Rights Act because of the use of an at-large system for electing city council members.  (Elec.[1] Code, §§ 14025-14032.)

Defendant presents only two challenges to the September 30, 2013 preliminary injunction.  First, defendant argues because it is a charter city, it cannot be subject to the California Voting Rights Act.  Defendant relies upon California Constitution, article[2] XI, section 5.  Second, defendant contends the preliminary injunction violates statutory provisions which prohibit enjoining a public official from fulfilling a ministerial duty to act pursuant to a public statute.  (Civ. Code, § 3423, subd. (d); Code Civ. Proc., § 526, subd. (b)(4).)  We respectfully reject these contentions and affirm the preliminary injunction insofar as it enjoins certification of the at-large city council election results.

# II.  VOTE DILUTION

Before discussing the present case, it is wise to describe what this case is about-- vote dilution.  Most local governance bodies in California are elected on an at-large basis; as in the case of defendant, a city council member runs for office city-wide rather than in a district.  (Assem. Com. on Elections, Reapportionment and Constitutional Amendments, Analysis of Sen. Bill No. 976 (2001-2002 Reg. Sess.) as amended Mar. 18,

---

[1]  Future statutory references are to the Elections Code unless otherwise noted.

[2]  Future references to an article are to the California Constitution.

2

2002, p. 2; Sen. Com. on Elections and Reapportionment, Rep. on Sen. Bill No. 976 (2001-2002 Reg. Sess.) as amended May 1, 2001, p. 1.) Sections 14025 through 14032 were adopted to prevent an at-large electoral system from diluting minority voting power and thereby impairing a protected class from influencing the outcome of an election. (Leg. Counsel's Dig., Sen. Bill No. 976 (Stats. 2000 (Reg. Sess. 2002) ch. 129, § 1, p. 93; 2002 Summary Dig. p. 55; see *Rey v. Madera Unified School Dist.* (2012) 203 Cal.App.4th 1223, 1228-1229.)

Our colleagues in the Fifth Appellate District succinctly described how vote dilution is proven in federal Voting Rights Act litigation: "'First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. . . . Second, the minority group must be able to show that it is politically cohesive. . . . Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate.' ([*Thornburg v.*] *Gingles*[ (1986)] 478 U.S. 30], 50-51 (fn. omitted).)" (*Sanchez v. City of Modesto* (2006) 145 Cal.App.4th 660, 668; see *Gomez v. Watsonville* (9th. Cir. 1988) 863 F.2d 1407, 1414-1417.) However, our Fifth District colleagues explained the California Voting Rights Act does not require that the plaintiff prove a "compact majority-minority" district is possible for *liability* purposes. (*Sanchez v. City of Modesto*, *supra*, 145 Cal.App.4th p. 669.) However, even under the California Voting Rights Act, geographical compactness remains a consideration in developing a remedy. (*Ibid*.) This difference between the federal and state statutory voting rights provisions is not an issue in this appeal. With this background in mind, we turn to the case at hand.

III. THE PLEADINGS

The March 28, 2013 first amended complaint alleges that defendant's at-large election system of city council members reduces the effect of the number of votes by Latino and African-American residents. Both the mayor and the city council members

3

are elected on an at-large basis. According to the first amended complaint, "The imposition of [defendant's] at-large method of election has resulted in vote dilution for the Latino and [African-American] residents and has denied them effective political participation in elections to the [c]ity [c]ouncil." The effect of the at-large method of election, according to the first amended complaint, prevents Latino and African-American residents from electing candidates of their choice. The first amended complaint alleges: "Despite a Latino population of approximately 54.4% and an [African-American] population of 14.8% in the City of Palmdale, no [African-American] has ever been elected to [defendant's city council], only one Latino has been elected to [defendant's city council] and no candidate of choice of Latino or [African-American] voters has been elected to the [defendant's city council] in the last ten years."

According to the first amended complaint, defendant's at-large electoral system has resulted in racially polarized voting: "Elections conducted within [defendant] are characterized by racially polarized voting. Racially polarized voting occurs when members of a protected class . . . vote for candidates and electoral choices that are different from the rest of the electorate. Racially polarized voting exists within [defendant] because there is a difference between the choice of candidates or other electoral choices that are preferred by Latino voters, [African-American] voters, and the choice of candidates or other electoral choices that are preferred by voters in the rest of the electorate." The first amended complaint gives specific examples of where racially polarized voting had occurred. Plaintiffs sought: a decree that defendant's at-large method of city council election violates the California Voting Rights Act; preliminary and permanent injunctive relief enjoining defendant from imposing or applying its current at-large method of election; injunctive relief requiring defendant to design and implement district-based elections or other appropriate alternative relief; and attorney's fees.

Defendant's answer denied the allegations concerning any violation of the California Voting Rights Act and contains 10 separate affirmative defenses. The ninth affirmative defense alleges defendant is a charter city. As a result, according to the

4

answer, defendant possesses "plenary" power to determine the manner of election of city council members. (Art. XI, § 5, subd. (b).)

## IV. TRIAL AND FINDINGS

On August 27, 2013, the trial court issued its final statement of decision. The trial court found: "Plaintiffs' expert and defendant's expert studied the [council] and mayoral election results for [defendant] since 2000. During that period, only one Latino candidate was elected and no African-American candidates were elected. [T]he one Latino candidate was elected in 2001, and none since. The failure of minority candidates to be elected to office does not by itself establish the presence of racially polarized voting. However, the regression analysis undertaken by both experts nevertheless established a clear history of a difference between choice of candidates preferred by the protected class in the choice of the non-protected class. [¶] Plaintiff's expert, Dr. Morgan Kousser, expressed the opinion that [defendant's] elections consistently and statistically exhibited racially polarized voting. The court finds the opinions expressed by Dr[.] Kousser to be persuasive. Although the methodology was somewhat different, the statistics compiled by defendant's expert, Douglas Johnson, likewise note the presence of racially polarized voting. While Mr. Johnson described some of the results as 'not stark,' the existence of racially polarized voting in his statistics could not be denied." As result, the trial court found defendant's at-large system of electing city council members violated section 14027. The trial court ruled, "Plaintiffs' evidence established that racially polarized voting occurred in the city council elections for [defendant]."

In addition, the trial court rejected defendant's argument that as a charter city, it could not be subject to the California Voting Rights Act. The trial court reasoned that the dilution of minority voting rights is a matter of statewide concern. In addition, the trial court ruled, "To the extent a conflict exists between [defendant's] charter provisions as to the election of its council members and the California Voting Rights Act, the court finds that the city is not immune from state legislative enactments in this area of statewide

5

concern." And, the trial court rejected several other constitutional objections interposed by defendant which are not pertinent to this appeal. The trial court then ruled it had broad discretion to select the appropriate remedies that are tailored to remedy the statutory violation at issue. The trial court selected September 20, 2013, for the hearing on the selection of the remedy.

On August 1, 2013, plaintiffs moved for issuance of a preliminary injunction enjoining defendant from conducting an at-large election on November 5, 2013. On September 17, 2013, defendant filed its opposition to plaintiff's preliminary injunction motion. Plaintiffs' reply to the opposition reiterated their position that further at-large elections should be enjoined. On September 30, 2013, the trial court issued its preliminary injunction. The trial court found plaintiffs had demonstrated a likelihood of success on their claim the at-large city council election method violated the California Voting Rights Act. Further, the trial court found, "Absent preliminary relief, the Plaintiffs, as well as the general public, would be irreparably harmed by [d]efendant holding an at-large election on November 5, 2013, or at any time before this Court proscribes the permanent relief contemplated by this Courts Propose Statement of Decision dated July 23, 2013." Based upon those findings, the trial court issued in part the following preliminary injunction, "[D]efendant . . . [is preliminarily enjoined] from holding an at-large election (as that term as defined in the [California Voting Rights Act]) for [defendant's] City Council, tabulating the results of such an at-large election, or certifying the results of such an at-large election."

On October 4, 2013, defendant filed a notice of appeal from the September 30, 2013 preliminary injunction. On October 10, 2013, defendant filed a supersedeas petition seeking to stay the September 30, 2013 preliminary injunction. Defendant argued: it is inappropriate to stay an election after the candidates have begun campaigning; the preliminary injunction violated section 13314; the balance of hardships weighed in favor of permitting the election to go forward; the Los Angeles County Registrar of Voters was an indispensable party who had not been served; an injunction against certification of the election results was improper and ineffective; the trial court abused its discretion by

6

refusing a temporary stay request to permit the appeal to proceed; and the trial court's refusal to require plaintiffs to post a bond rendered the injunction illegal. Eventually after the trial court clarified its ruling on the bond issue, we denied the supersedeas petition. (*Jauregui v. City of Palmdale* (Oct. 15, 2013, B251793) [nonpub. order].) A majority of this court focused upon the disjunctive nature of the injunction and concluded the order, as drafted, created three potential acts which were subject to equitable relief: a proscription against holding an at-large election; counting the votes; or certifying the results of an at-large election. The dissenting justice ruled the preliminary injunction's text and the parties' conduct at the hearing showed the trial court plainly enjoined all aspects of the election--voting, tabulation and certification. Whether the majority or the dissenter was correct in their legal analysis in assessing the impact of the preliminary injunction is not an issue before us. The parties have not briefed that issue and it is irrelevant to the outcome of defendant's appeal. It is relevant though as to how the trial court and parties reacted to our October 15, 2013 order denying plaintiffs' supersedeas petition. The parties and the trial court acquiesced in the majority's analysis and agreed that only one act could be enjoined. Therefore, the election was held, the votes were tabulated, but the results were not certified. The trial court eventually entered its final plan which is the subject of a separate appeal in which briefing has not yet commenced. That final plan, which requires election of city council members by districts, is not before us. Nothing in this or the concurring opinion constitutes an expression of views by any justice as to how that pending appeal will be resolved.

Before addressing the parties' contentions, two points bear emphasis. To begin with, none of the trial court's findings concerning voter dilution has been challenged in defendant's briefs. Any contention that the trial court's findings are incorrect in this regard has been forfeited. (*Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4; *Johnston v. Board of Supervisors* (1947) 31 Cal.2d 66, 70, disapproved on another point in *Bailey v. Los Angeles* (1956) 46 Cal.2d 132, 139.) Defendant has the burden of showing the trial court's rulings on the first amended complaint's merits, whether voter dilution is occurring, are incorrect. (*Sanchez v.*

*State* (2009) 179 Cal.App.4th 467, 485; *Antelope Valley Press v. Poizner* (2008) 162 Cal.App.4th 839, 849, fn. 11.) The trial court's dilution findings are presumed to be correct. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133; *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) Further, the parties advert to many of the events occurring after the preliminary injunction was entered. Most of these events which include the election results are post-preliminary injunction matters which are not properly before us. (*In re Zeth S.* (2003) 31 Cal.4th 396, 405-414; see *California Farm Bureau Federation v. State Water Resources Control Bd.* (2011) 51 Cal.4th 421, 442.)

## V. DISCUSSION

### A. California Voting Rights Act

The California Voting Rights Act was enacted to implement the equal protection and voting guarantees of article I, section 7, subdivision (a) and article II, section 2 which we discuss later. (§ 14031.) Section 14027 sets forth the circumstances where an at-large electoral system may not be imposed to dilute or abridge a protected class's opportunity to elect candidates, "An at-large method of election may not be imposed or applied in a manner that impairs the ability of a protected class to elect candidates of its choice or its ability to influence the outcome of an election, as a result of the dilution or the abridgment of the rights of voters who are members of a protected class, as defined pursuant to Section 14026." (See *Sanchez v. City of Modesto, supra,* 145 Cal.App.4th at p. 669.) Section 14026, subdivision (d) defines the term "protected class" as follows, "'Protected class' means a class of voters who are members of a race, color or language minority group, as this class is referenced and defined in the federal Voting Rights Act (42 U.S.C. Sec. 1973 et seq.)." Section 14026, subdivision (e) defines racially polarized voting thusly, "'Racially polarized voting' means voting in which there is a difference, as defined in case law regarding enforcement of the federal Voting Rights Act (42 U.S.C. Sec. 1973 et seq.), in the choice of candidates or other electoral choices that are preferred

8

by voters in a protected class, and in the choice of candidates and electoral choices that are preferred by voters in the rest of the electorate . . . ."

Proof of racially polarized voting patterns are established by examining voting results of: elections where at least one candidate is a member of a protected class; elections involving ballot measures; or other "electoral choices that affect the rights and privileges" of protected class members. (§ 14028, subd. (b).) The evidentiary effect of evidence of polarized voting patterns may depend on whether voting occurs after the filing of a lawsuit challenging an at-large electoral system. Section 14028, subdivision (a) states, "Elections conducted prior to the filing of an action pursuant to Section 14027 and this section are more probative to establish the existence of racially polarized voting than elections conducted after the filing of the action."

There are a variety of factors a court may consider in determining whether an at-large electoral system impairs a protected class's ability to elect candidates or otherwise dilute their voting power. Section 14026, subdivision (e) states, "The methodologies for estimating group voting behavior as approved in applicable federal cases to enforce the federal Voting Rights Act (42 U.S.C. Sec. 1973 et seq.) to establish racially polarized voting may be used for purposes of this section to prove that elections are characterized by racially polarized voting." (§ 14026, subd. (e).) Section 14028, subdivisions (b), (c) and (e) identify other factors that may be considered in determining whether racially polarized voting has occurred.[3] But proof of an intent to discriminate is not an element of

---

[3] Section 14028, subdivisions (b), (c) and (e) provide: "(b) One circumstance that may be considered in determining a violation of Section 14027 and this section is the extent to which candidates who are members of a protected class and who are preferred by voters of the protected class, as determined by an analysis of voting behavior, have been elected to the governing body of a political subdivision that is the subject of an action based on Section 14027 and this section. In multiseat at-large election districts, where the number of candidates who are members of a protected class is fewer than the number of seats available, the relative groupwide support received by candidates from members of a protected class shall be the basis for the racial polarization analysis. [¶] (c) The fact that members of a protected class are not geographically compact or concentrated may not preclude a finding of racially polarized voting, or a violation of Section 14027 and this section, but may be a factor in determining an appropriate

9

a violation of section 14027.  (§ 14028, subd. (d).)  A trial court is authorized to implement appropriate remedies including imposition of district-based elections. (§ 14029.)  Prevailing plaintiffs are entitled to attorney fees.  (§ 14030; see *Sanchez v. City of Modesto*, *supra*, 145 Cal.App.4th at p. 670.)

## B.  Charter City Rights Over Municipal Matters

### 1.  Organization of municipalities and the constitutional limitation on legislative enactments for charter cities

The Legislature recognizes two types of cities.  The first kind, a municipality organized under a charter, is a charter city.  (Gov. Code, § 34101; *O'Connell v. City of Stockton* (2007) 41 Cal.4th 1061, 1075-1076.)  The second type, which is organized under the general law of the Legislature, is referred to as a general law city.  (Gov. Code, § 34102; *People v. Chacon* (2007) 40 Cal.4th, 558, 571, fn. 13.)  Defendant is a charter city.  Defendant argues that section 14027 does not apply to its municipal elections. Defendant argues that elections are a "municipal matter."  And, as a charter city, defendant contends the Legislature has no power to enact a law which permits a court to abolish an at-large election system.  Defendant relies on article XI, section (5).[4]

---

remedy.  [¶]  . . .  (e)  Other factors such as the history of discrimination, the use of electoral devices or other voting practices or procedures that may enhance the dilutive effects of at-large elections, denial of access to those processes determining which groups of candidates will receive financial or other support in a given election, the extent to which members of a protected class bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process, and the use of overt or subtle racial appeals in political campaigns are probative, but not necessary factors to establish a violation of Section 14027 and this section."

[4]  Article XI, section (5) states:  "(a)  It shall be competent in any city charter to provide that the city governed thereunder may make and enforce all ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to

10

However, a charter city's authority to enact legislation is not unlimited. Our Supreme Court has described article XI, section (5) as granting charter cities the authority to enact laws concerning municipal matters subject to only limited exceptions, "The provision represents an 'affirmative constitutional grant to charter cities of "all powers appropriate for a municipality to possess . . ." and [includes] the important corollary that "so far as 'municipal affairs' are concerned," charter cities are "supreme and beyond the reach of legislative enactment."'" (*State Building & Construction Trades Council of Cal., AFL-CIO v. City of Vista* (2012) 54 Cal.4th 547, 555 (*State Building & Construction Trades Council*) quoting *California Fed. Savings & Loan Assn. v. City of Los Angeles* (1991) 54 Cal.3d 1, 12 (*California Fed. Savings*).) According to our Supreme Court, "Charter cities are specifically authorized by our state Constitution to govern themselves, free of state legislative intrusion, as to those matters deemed municipal affairs." (*State Building & Construction Trades Council, supra,* at p. 555); *Johnson v. Bradley* (1992) 4 Cal.4th 389, 397; see *Edgerly v. City of Oakland* (2012) 211 Cal.App.4th 1191, 1204.)

Our Supreme Court has explained we engage in four steps in evaluating whether a charter city's law may contradict a state statute. First, we determine whether the city ordinance at issue regulates an activity that can be characterized as a "municipal affair." (*State Building & Construction Trades Council, supra,* 54 Cal.4th at p. 556; *California*

---

general laws. City charters adopted pursuant to this Constitution shall supersede any existing charter, and with respect to municipal affairs shall supersede all laws inconsistent therewith. [¶] (b) It shall be competent in all city charters to provide, in addition to those provisions allowable by this Constitution, and by the laws of the State for: (1) the constitution, regulation, and government of the city police force (2) subgovernment in all or part of a city (3) conduct of city elections and (4) plenary authority is hereby granted, subject only to the restrictions of this article, to provide therein or by amendment thereto, the manner in which, the method by which, the times at which, and the terms for which the several municipal officers and employees whose compensation is paid by the city shall be elected or appointed, and for their removal, and for their compensation, and for the number of deputies, clerks and other employees that each shall have, and for the compensation, method of appointment, qualifications, tenure of office and removal of such deputies, clerks and other employees."

11

*Fed. Savings*, *supra*, 54 Cal.3d p. 16.)  Second, we must determine whether the case presents an actual conflict between local and state law.  (*State Building & Construction Trades Council, supra,* 54 Cal.4th at p. 556; *California Fed. Savings*, *supra*, 54 Cal. 3d at p. 16.)  Third, we decide whether the state law, in this case section 14027, addresses a matter of "'statewide concern.'"  (*State Building & Construction Trades Council, supra,* 54 Cal.4th at p. 556; *California Fed. Savings*, *supra*, 54 Cal.3d at p. 17.)  Fourth, we must decide whether section 14027 is "'reasonably related to . . . resolution'" of that issue of that statewide concern.  (*State Building & Construction Trades Council, supra,* 54 Cal.4th at p. 556; *California Fed. Savings*, *supra*, 54 Cal.3d at p. 17.)  And in connection with this fourth matter for determination, we must decide whether section 14027 is "'narrowly tailored'" to avoid unnecessary interference in municipal governance.  (*State Building & Construction Trades Council, supra,* 54 Cal.4th at p. 556; *California Fed. Savings*, *supra*, 54 Cal.3d at p. 24.).  After engaging in that analysis, our Supreme Court has delineated how we resolve the ultimate preemption question:  "'If . . . the court is persuaded that the subject of the state statute is one of statewide concern and that the statute is reasonably related to its resolution [and not unduly broad in its sweep], then the conflicting charter city measure ceases to be a "municipal affair" pro tanto and the Legislature is not prohibited by article XI, section 5(a), from addressing the statewide dimension by its own tailored enactments.'"  (*State Building & Construction Trades Council, supra,* 54 Cal.4th at p. 556; *California Fed. Savings*, *supra*, 54 Cal.3d at p. 17.)  We now apply these principles to our case.

2.  Application of the four factors for determining whether section 14027 applies to defendant notwithstanding its status as a charter city

a.  municipal elections are a municipal affair

The first issue is whether defendant's selection of city-wide elections is a municipal matter.  It is.  Commonsense tells us how city council members are elected is

12

the essence of a municipal affair. Further, article XI, section 5, subdivision (b) expressly identifies the conduct of city elections as a municipal affair. (*Johnson v. Bradley*, *supra,* 4 Cal.4th at p. 398 [elections are one of four core areas identified in art. XI, § 5 and are by definition municipal affairs]; *Cobb v. O'Connell* (2005) 134 Cal.App.4th 91, 96 [same].)

<br>

### b. existence of an actual conflict

<br>

The second issue is whether there is an actual conflict between section 14027 and defendant's city charter provision. Our Supreme Court has not defined actual conflict for purposes of evaluating the lawfulness of a charter city's law. But our Supreme Court has stated courts must carefully insure that the purported conflict is genuine and irresolvable short of choosing between one enactment and the other. (*Johnson v. Bradley*, *supra*, 4 Cal.4th at p. 399; *California Fed. Savings*, *supra*, 54 Cal.3d p. 17.)

In some cases, the question of whether there is a true conflict is easy to assess— the local and statewide enactment are entirely at odds. (*State Building & Construction Trades Council, supra,* 54 Cal.4th at pp. 559-560 [local provision adopted pursuant to a ballot measure prohibited compliance with state prevailing wage law except in unrelated circumstances]; *City of Watsonville v. State Dept. of Health Services* (2005) 133 Cal.App.4th 875, 883-886 [municipal ordinance banning injecting non-federally approved substances into drinking water actually conflicts with state law requiring fluoridation of water systems with at least 10,000 hookups]; *California Apartment Assn. v. City of Stockton* (2000) 80 Cal.App.4th 699, 705 [Pub. Util. Code, § 10009.6 prohibits recouping tenant's unpaid utility bills from land owners and subsequent renters while a local ordinance permitted it]; *Barajas v. City of Anaheim* (1993) 15 Cal.App.4th 1808, 1817 [as construed, Veh. Code, § 22455 barred a municipality from prohibiting vending from motor vehicles parked on streets and the Anaheim Municipal Code banned all such sales]; *Fielder v. City of Los Angeles* (1993) 14 Cal.App.4th 137, 140-143 [Gov. Code, § 53725, subd. (a) prohibited imposition of a specified tax on real property transfers and a

local ordinance imposed a tax on instruments that conveyed realty].)  Other cases easily find that no actual conflict exists.  (*Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 365 ["[Pub. Contract Code, § 20128], requiring contracts be let to the 'lowest responsible bidder,' and San Francisco Administrative Code [§ 6.1], using the formulation 'lowest reliable and responsible bidder,' do not conflict."]; *Griffith v. City of Santa Cruz* (2012) 207 Cal.App.4th 982, 990-993 [no actual conflict between state law establishing building standards and local ordinance requiring annual inspections of residential rental properties]; *Cobb v. O'Connell*, *supra*, 134 Cal.App.4th at p. 97 [no actual conflict between a state law temporarily appointing an administrator in charge of the Oakland schools and a city charter provision for election of school board members].)

Citing *Sherwin-Williams Co. v. City of Los Angeles* (1993) 4 Cal.4th 893, 897, some decisions use traditional preemption jurisprudence in assessing whether an actual conflict exists.  (*California Veterinary Medical Assn. v. City of West Hollywood* (2007) 152 Cal.App.4th 536, 548-562; *City of Watsonville v. State Dept. of Health Services*, *supra*, 133 Cal.App.4th at pp. 883, 885-886; *Barajas v. City of Anaheim*, *supra*, 15 Cal.App.4th at pp. 1813-1817.)  Or, a court may take into account how a local ordinance is applied by the municipality  (*City of Watsonville v. State Dept. of Health Services*, *supra*, 133 Cal.App.4th at pp. 881-882 [city ordinance made no reference to fluoridation but its effect was to ban any spending on systems to fluoridate water]; *California Apartment Assn. v. City of Stockton*, *supra*, 80 Cal.App.4th at p. 705 ["The ordinances, as applied by the city, impose joint liability upon a person or entity, the property owner, which is not a party to the tenant's contract, for the debt of a tenant."].)  Also, a local enactment may only contravene some aspects of a state law or do so only to an extent. (See *Domar Electric, Inc. v. City of Los Angeles* (1995) 41 Cal.App.4th 810, 822 ["to the extent that [Pub.] Contract Code[, §] 2000 and the Board's outreach program are in conflict, the program must yield to the statute"].)

Section 14027 and defendant's city-wide council elections process are in actual conflict under the present circumstances.  Section 14027 does not prohibit city-wide

14

council elections. (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 976 (2001-2002 Reg. Sess.) as amended Apr. 9, 2002, p. 3.) In that sense, no actual conflict exists. City-wide elections where there is no vote dilution are not in actual conflict with section 14027. But if there is a dilution of a protected class's voting rights, then defendant's at-large electoral system actually conflicts with section 14027. Section 14027 applies only when there has been vote dilution. (*Sanchez v. City of Modesto*, *supra*, 145 Cal.App.4th at p. 667.) The trial court's unquestioned findings demonstrate that defendant's at-large system dilutes the votes of Latino and African-American voters. Based on the undisputed facts, defendant's at-large method of election is in actual conflict with section 14027 when it is imposed or applied in a manner that: impairs the ability of a protected class to elect candidates of its choice; impairs the ability of a protected class to influence the outcome of an election; and this impairment results from diluting or abridging the rights of voters who are members of a protected class. When this happens, a trial court may order the implementation of authorized appropriate remedies including imposing district-based elections. (§ 14029.) To this extent, given the trial court's unchallenged findings, defendant's system of at-large elections is in actual conflict with section 14027 which squarely prohibits vote dilution under specified circumstances.

### c. section 14027 addresses an issue of statewide concern

*i. plaintiffs' arguments and how to evaluate whether an issue is of statewide concern*

Plaintiffs contend that section 14027 addresses an issue of statewide concern. Our Supreme Court has explained the proper approach in evaluating whether a statewide concern is present: "'[T]he hinge of the decision is the identification of a convincing basis for legislative action originating in extramunicipal concerns, one justifying legislative supersession based on sensible, pragmatic considerations.' (*California Fed. Savings*, *supra*, 54 Cal.3d at p. 18.) In other words, for state law to control there must be something more than an abstract state interest, as it is always possible to articulate some

15

state interest in even the most local of matters.  Rather, there must be 'a convincing basis' for the state's action—a basis that 'justif[ies]' the state's interference in what would otherwise be a merely local affair.  (*Ibid*.)"  (*State Building & Construction Trades Council, supra,* 54 Cal.4th at p. 560.)  In *California Fed. Savings*, *supra*, 54 Cal.3d at pages 17 and 18, our Supreme Court explained:  "In performing that constitutional task, courts should avoid the error of 'compartmentalization,' that is, of cordoning off an entire area of governmental activity as either a 'municipal affair' or one of statewide concern.  . . .  When a court invalidates a charter city measure in favor of a conflicting state statute, the result does not necessarily rest on the conclusion that the subject matter of the former is not appropriate for municipal regulation.  It means, rather, that under the historical circumstances presented, the state has a more substantial interest in the subject than the charter city."  (See *State Building & Construction Trades Council, supra,* 54 Cal.4th at p. 557-558.)  Ultimately, these are legal determinations.  (*California Fed. Savings*, *supra*, 54 Cal.3d at p. 17.)

Given the history of our nation and California, there is a convincing basis for the Legislature to act in what otherwise be a local affair--city council elections. Plaintiffs argue that the sections 14025 through 14032 implement the equal protection and voting rights provisions of the state Constitution.  (Art. I, § 7, subd. (a), art. II, § 2.[5]) Section 14031 states the California Voting Rights Act was adopted to implement the voting and equal protections provisions article I, section 7, subdivision (a) and article II, section 2.  Further, they argue integrity in the manner in which local elections are conducted is a matter of statewide concern.  Plaintiffs argue these constitutional and integrity driven concerns are statewide in nature. We agree.

---

[5] Article I, section 7, subdivision (a) states, "A person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws . . . ." Article II, section 2 states, "A United States citizen 18 years of age and resident in this state may vote."

*ii. the right to vote and equal protection*

The right to vote is fundamental. (*Board of Supervisors v. Local Agency Formation Com.* (1992) 3 Cal.4th 903, 913; *Peterson v. City of San Diego* (1983) 34 Cal.3d 225, 229.) Typically, challenges to state restrictions on voting and the like have been brought under the federal equal protection clause. (See *Legal Services for Prisoners with Children v. Bowen* (2009) 170 Cal.App.4th 447, 452.) The federal equal protection clause applies to voting rights issues. (*Calderon v. City of Los Angeles* (1971) 4 Cal.3d 251, 260-261 [dilution of voting strength of racial minorities is constitutionally suspect].) The reaches of the state and federal equal protection clauses are not the same for all purposes. (*Butt v. State of California* (1992) 4 Cal.4th 668, 683, 685; *Sanchez v. City of Modesto*, *supra*, 145 Cal.App.4th at p. 678.) But the state equal protection clause quite naturally applies to voting related issues. (*Citizens Against Forced Annexation v. Local Agency Formation Com.* (1982) 32 Cal.3d 818, 829, overruled on other grounds in *Board of Supervisors v. Local Agency Formation Com., supra,* 3 Cal.4th at p. 921; *Hoffman v. State Bar of California* (2003) 113 Cal.App.4th 630, 640-641, 645; see *Greene v. Marin County Flood Control & Water Conservation Dist.* (2010) 49 Cal.4th 277, 297*; Neilson v. City of California City* (2005) 133 Cal.App.4th 1296, 1301, 1314 & fn. 7.) Our Supreme Court has described the Fourteenth Amendment and article I, section 2 as providing comparable protections in voting rights cases. (*Canaan v. Abdelnour* (1985) 40 Cal.3d 703, 715, overruled on another point in *Edelstein v. City and County of San Francisco* (2002) 29 Cal.4th 164, 183.) California decisions involving voting issues quite closely follow federal Fourteenth Amendment analysis. (*Id.* at p. 715.) Minority vote dilution can violate the Fourteenth Amendment. (*Reno v. Bossier Parish School Bd.* (1997) 520 U.S. 471, 479-480; *White v. Regester* (1973) 412 U.S. 755, 766.) Thus, as in the case of the Fourteenth Amendment, article I, section 2 protects members of a protected class against dilution of their votes because of the manner in which elections are conducted.

The rights of protected classes against dilution of their votes do not arise *merely* from a municipal concern. Rather, they arise from the essence of a democratic form of government. This does not involve an abstract state interest--it is one that goes to the legitimacy of the electoral process. California has a greater interest in insuring vote dilution does not occur in any election in our state than defendant has in electing city council members city-wide. And this statewide concern applies in every council election in all California cities. The constitutionally based protection against race-based dilution of voter rights is a matter of statewide concern.

### iii. integrity in the electoral process

Even if constitutionally mandated voting and equal protection concerns do not constitute a statewide interest, our Supreme Court has explained that integrity in the municipal electoral process is. In *Johnson v. Bradley*, *supra*, 4 Cal.4th at pages 392-394, our Supreme Court evaluated a charter city's ordinance that provided for partial funding of campaigns for local offices. The charter city's ordinance was challenged because it conflicted with Proposition 73, a statewide initiative which banned public financing of any election campaign. The city argued the statewide limitation on public financing of campaigns did not apply to a municipal campaign. The city relied upon its status as a charter city and article XI, section 5. (*Johnson v. Bradley*, *supra*, 4 Cal.4th at pp. 397-411.) While discussing whether a statewide concern was present, our Supreme Court explained: "[P]etitioners assert: (i) the 'integrity of the electoral process' is itself a statewide concern; (ii) section 85300's ban on public funding of election campaigns is reasonably calculated to resolve that statewide concern; and (iii) therefore section 85300 addresses a statewide concern. [¶] We have no reason to doubt petitioners' major premise; the integrity of the electoral process, at both the state and local level, is undoubtedly a statewide concern. The basis for this conclusion was well stated in an Attorney General opinion in 1960, in support of a conclusion that a charter city candidate is obligated to comply with statewide campaign financial disclosure provisions: [¶]

18

'Purity of all elections is a matter of statewide concern, not just a municipal affair. . . . The Legislature . . . has found that it is in the public interest that full and detailed disclosure be made of all contributions and expenditures in election campaigns. . . . Elected officials of the various municipalities chartered and non-chartered throughout the state of California exercise a substantial amount of executive and legislative power over the people of the state of California, and this legislation aimed at obtaining the election of persons free from domination by self-seeking individuals or pressure groups is a matter of statewide concern.' (35 Ops.Cal.Atty.Gen. 230, 231-232 (1960).)" (*Id*. at pp. 408-409.) In one respect *Johnson* involves our very issue--whether integrity of elections in a charter city is a matter of statewide concern for purposes of article XI, section 5. Based on the analysis in *Johnson* and commonsense, we conclude integrity in city council elections is a matter of statewide concern. Electoral results lack integrity where a protected class is denied equal participation in the electoral process because of vote dilution. Thus, section 14027 addresses an issue of statewide concern.

### d. sections 14025 through 14032 are narrowly drawn and reasonably related to elimination of dilution of the votes of protected classes

As noted, having concluded the voter dilution of a protected class is a statewide concern, two additional issues must be decided. Initially, we must decide whether sections 14025 through 14032 are "'narrowly tailored'" to avoid unnecessary interference in municipal governance. (*State Building & Construction Trades Council, supra*, 54 Cal.4th at p. 556; *California Fed. Savings*, *supra*, 54 Cal.3d p. 24.) They do not unnecessarily interfere in municipal governance. They have no application to a city which elects council members by district. And sections 14025 through 14032 do not apply to city-wide council elections unless vote dilution has occurred. More to the point, sections 14025 through 14032 apply *only* if there is dilution of protected classes' votes. Sections 14025 through 14032 are narrowly tailored to avoid unnecessary interference in

19

municipal governance.  Put another way, sections 14025 through 14032 can necessarily only interfere with municipal governance when vote dilution is present.

Finally, sections 14025 through 14032 are reasonably related to the resolution of the statewide concerns and not unduly broad in their sweep.  (*State Building & Construction Trades Council, supra,* 54 Cal.4th at p. 556; *California Fed. Savings*, *supra*, 54 Cal.3d p. 24.)  Sections 14025 through 14032 are reasonably related to the right to vote, equal protection and integrity of elections statewide concerns we have discussed.  Sections 14025 through 14032 allow citizens to challenge city-wide elections and, *only if there is vote dilution*, permit a court to impose reasonable remedies to alleviate the problem.

### e.  conclusion

To sum up, the manner of selecting city council members is a municipal affair.  There is an actual conflict between sections 14025 through 14032 and defendant's mode of electing city council members.  The actual conflict is demonstrated by the trial court's unquestioned vote dilution findings.  The dilution of votes of a protected class is matter of statewide concern.  Sections 14025 through 14032 are reasonably related to the issue of vote dilution and constitute a narrowly drawn remedy which does not unnecessarily interfere in municipal governance.  Article XI, section 5 does not bar the enforcement of sections 14025 through 14032.

### 3.  Defendant's Plenary Authority Argument

Defendant relies on language in article XI, section 5, subdivision (b) adverting to a charter city's "plenary authority" over elections.  The language at issue, which is italicized, is as follows:  "It shall be competent in all city charters to provide, in addition to those provisions allowable by this Constitution, and by the laws of the State for . . . conduct of city elections *and . . . plenary authority is hereby granted, subject only*

*to the restrictions of this article, to provide therein or by amendment thereto, the manner in which, the method by which, the times at which, and the terms for which the several municipal officers and employees whose compensation is paid by the city shall be elected . . .* and for the number of deputies, clerks and other employees that each shall have, and for the compensation, method of appointment, qualifications, tenure of office and removal of such deputies, clerks and other employees." (Art. XI, § 5, subd. (b).) Defendant reasons this plenary authority precludes the Legislature from regulating those matters specified in article XI, section 5, subdivision (b) which includes local elections. This contention has no merit.

This very argument was rejected by our Supreme Court in *People ex rel. Seal Beach Police Officers Assn. v. City of Seal Beach* (1984) 36 Cal.3d 591, 600 (*Seal Beach*). In *Seal Beach*, the issue involved public employment, not an election. Our Supreme Court described the issue thusly: "The issue is whether the city council of a charter city must comply with the Meyers-Milias-Brown Act's . . . 'meet-and-confer' requirement (Gov. Code, § 3505) before it proposes an amendment to the city charter concerning the terms and conditions of public employment." (*Seal Beach, supra,* 36 Cal.3d at p. 594.) The defendant, the City of Seal Beach, argued the grant of plenary authority in article XI, section 5, subdivision (b) allowed it to disregard the statewide meet and confer requirement. (*Seal Beach, supra,* 36 Cal.3d at pp. 599-600.) As can be noted, the plenary authority language in article XI, section 5, subdivision (b) extends to charter city employee related matters. Our Supreme Court quoted the foregoing "plenary authority" language in article XI, section 5, subdivision (b) in the immediately preceding paragraph and concluded: "What grant of power could sound more absolute? Yet in an unbroken series of public employee cases, starting with *Professional Fire Fighters, Inc. v. City of Los Angeles* (1963) 60 Cal.2d 276, 289-295 and ending for the time being with *Baggett v. Gates* (1982) 32 Cal.3d 128, 135, 140, it has been held that a 'general law prevails over local enactments of a chartered city, even in regard to matters which would otherwise be deemed to be strictly municipal affairs, where the subject matter of the general law is of statewide concern.' (*Professional Fire Fighters, supra,* 60 Cal.2d at p.

21

292.)" (*Seal Beach*, *supra*, 36 Cal.3d at p. 600, fn. omitted.) This analysis applies with equal force in the municipal election context. The plenary authority identified in article XI, section 5, subdivision (b) can be preempted by a statewide law after engaging in the four-step evaluation process specified by our Supreme Court. (*State Building & Construction Trades Council, supra,* 54 Cal.4th at p. 556; *California Fed. Savings*, *supra*, 54 Cal.3d pp. 16-17, 24.)

## C. The Trial Court Had The Authority To Enjoin The Certification Of The Election Results Pursuant To Section 14029

As our Supreme Court explained in *People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1109, we apply the following standards of review: "At this initial stage in the proceeding, the scope of our inquiry is narrow. We review an order granting a preliminary injunction under an abuse of discretion standard. [Citations.] Review is confined, in other words, to a consideration whether the trial court abused its discretion in '"evaluat[ing] two interrelated factors when deciding whether or not to issue a preliminary injunction. The first is the likelihood that the plaintiff will prevail on the merits at trial. The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm the defendant is likely to suffer if the preliminary injunction were issued."' [Citation.]" (*People ex rel. Reisig v. Acuna* (2010) 182 Cal.App.4th 866, 872-873.) We apply a separate standard of review, though, to legal and factual issues. (*Bullock v. City and County of San Francisco* (1990) 221 Cal.App.3d 1072, 1094 ["the standard of review [for issues of pure law] is not abuse of discretion but whether statutory or constitutional law was correctly interpreted and applied by the trial court"]; see *California Assn. of Dispensing Opticians v. Pearle Vision Center, Inc.* (1983) 143 Cal.App.3d 419, 426.)

The issue before us is whether the trial court could enjoin certification of the election results. Section 15400[6] requires a governing body, in this case the city council, to declare the winner of the election. Defendant argues that the trial court did not have the jurisdiction enjoin certification of the election results. Defendant relies on Code of Civil Procedure section 526, subdivision (b)(4) and Civil Code section 3423, subdivision (d).[7] These statutes have been discussed in connection with injunctive relief claims against public officials executing laws in electoral contexts. (*Drumhiller v. Wright* (1923) 64 Cal.App. 498, 501; see *Kevelin v. Jordan* (1964) 62 Cal.2d 82, 83; *Santa Clara County v. Superior Court* (1949) 33 Cal.2d 552, 554-555; *Wright v. Jordan* (1923) 192 Cal. 704, 710; *People v. Board of Supervisors* (1888) 75 Cal.179, 180-182; *Martinez v. Board of Supervisors* (1972) 23 Cal.App.3d 679, 684-685.)

Even if the two foregoing statutes apply to this case, section 14029 is an exception to Code of Civil Procedure section 526, subdivision (b)(4) and Civil Code section 3423, subdivision (d). As noted, section 14029 states, "Upon a finding of a violation of Section 14027 and Section 14028, the court shall implement *appropriate remedies*, including the imposition of district-based elections, that are tailored to remedy the violation." (Italics added.) What constitutes "appropriate remedies" within the meaning of section 14029 is ambiguous. This is hence an issue of statutory interpretation. We apply the following standards of statutory review described by our Supreme Court: "When interpreting a statute our primary task is to determine the Legislature's intent. [Citation.] In doing so we turn first to the statutory language, since the words the Legislature chose are the best indicators of its intent." (*Freedom Newspapers, Inc. v. Orange County Employees*

---

[6] Section 15400 states in part, "The governing body shall declare elected or nominated to each office voted on at each election under its jurisdiction the person having the highest number of votes for that office, or who was elected or nominated . . . ."

[7] Code of Civil Procedure section 526, subdivision (b)(4) states: "(b) An injunction cannot be granted in the following cases: [¶] . . . (4) To prevent the execution of a public statute by officers of the law for the public benefit." Civil Code section 3423, subdivision (d) states: "An injunction may not be granted: [¶] . . . (d) To prevent the execution of a public statute, by officers of the law, for the public benefit."

23

*Retirement System* (1993) 6 Cal.4th 821, 826; *People v. Jones* (1993) 5 Cal.4th 1142, 1146.)  Further, our Supreme Court has noted: "'If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature (in the case of a statute) . . . .'" (*Delaney v. Superior Court* (1990) 50 Cal.3d 785, 798.)  However, the literal meaning of a statute must be in accord with its purpose as our Supreme Court noted in *Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 658-659 as follows:  "We are not prohibited 'from determining whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute.  The meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible. [Citation.]  Literal construction should not prevail if it is contrary to the legislative intent apparent in the [statute] . . . .'"  In *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735, our Supreme Court added:  "The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act.  [Citations.]  An interpretation that renders related provisions nugatory must be avoided [citation]; each sentence must be read not in isolation but in the light of the statutory scheme [citation] . . . ."  (See *Troppman v. Valverde* (2007) 40 Cal.4th 1121, 1135, fn. 10.)  Further, a remedial statute's protective purpose is to be construed liberally on behalf of the class of persons it is designed to protect.  (*Pineda v. Williams-Sonoma Stores, Inc.* (2011) 51 Cal.4th 524, 530 ["'[C]ivil statutes for the protection of the public are, generally, broadly construed in favor of that protective purpose."']; *People ex rel. Dept. of Transportation v. Muller* (1984) 36 Cal.3d 263, 269 ["'The rule of law in the construction of remedial statutes requires great liberality, and wherever the meaning is doubtful, it must be so construed as to extend the remedy."  [Citation.]"'].)

To begin with, section 14029 is a later enacted and more specific injunctive relief provision than Code of Civil Procedure section 526, subdivision (b)(4) and Civil Code section 3423, subdivision (d).  Under these circumstances, the more specific and later enacted statute, section 14029, ordinarily must be enforced.  (*Governing Board v. Mann*

24

(1977) 18 Cal.3d 819, 828 ["[W]hen, as here, a subsequently enacted specific statute directly conflicts with an earlier, more general provision, it is settled that the subsequent legislation effects a limited repeal of the former statute to the extent that the two are irreconcilable."]; *Serrano v. Priest* (1971) 5 Cal.3d 584, 596 ["If the two provisions were found irreconcilable, [the newer statute] would prevail because it is more specific and was adopted more recently."]; *County of Placer v. Aetna Cas. etc. Co.* (1958) 50 Cal.2d 182, 189 ["'Where the terms of a later specific statute apply to a situation covered by an earlier general one, the later specific statute controls . . . .'"]; *In re Williamson* (1954) 43 Cal.2d 651, 654 ["'Where the special statute is later it will be regarded as an exception to or qualification of the prior general one . . . .'"].)

Moreover, the federal Voting Rights Act, title 42 United States Code section 1971, provides the context for the California Legislature's determination to adopt sections 14025 through 14032. (*Sanchez v. City of Modesto*, *supra*, 145 Cal.App.4th at p. 667 ["Some background on federal voting rights law is helpful to provide context for the [California Voting Rights Act]."].) The Legislature intended to provide a broader basis for relief from vote dilution than available under the federal Voting Rights Act. (*Id.* at p. 669; see Assem. Com. on Judiciary, Analysis of Sen. Bill No. 976 (2001-2002 Reg. Sess.) as amended Apr. 9, 2002, p. 3.) Legislative committee reports liberally refer to federal Voting Rights Act and related decisional authority. (Sen. Com on Elections and Reapportionment, Analysis of Sen. Bill No. 976 (2001-2002 Reg. Sess.) May 2, 2001, as amended May 1, 2001, pp. 1, 3, Sen. Rules Com., Office of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 976 (2001-2002 Reg. Sess.) May 8, 2001, as amended May 1, 2001, pp. 2, 5; Sen. Rules Com., Office of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 976 (2001-2002 Reg. Sess.) June 1, 2001, as amended May 1, 2001, pp. 2, 5; Sen. Rules Com., Office of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 976 (2001-2002 Reg. Sess.) Jan. 8, 2002, as amended May 1, 2001, pp. 2, 5; Assem. Com. on Elections, Reapportionment and Constitutional Amendments, Analysis of Sen. Bill No. 976 (2001-2002 Reg. Sess.) Apr. 2, 2002, as amended Mar. 18, 2002, pp. 3-4; Assem. Com. on Elections, Reapportionment and Constitutional Amendments,

25

Analysis of Sen. Bill No. 976 (2001-2002 Reg. Sess.) Apr. 16, 2002, as amended Apr. 9, 2002, pp. 3-4; Assem. Com. on Judiciary, *op. cit.*, pp. 2-4; Sen. Third Reading Analysis of Sen. Bill No. 976 (2001-2002 Reg. Sess.), as amended Jun. 11, 2002, pp. 3-4; Sen. Rules Com., Office of Sen. Floor Analyses, Analysis of Sen. Bill No. 976 (2001-2002 Reg. Sess.) June 21, 2002, as amended Jun. 11, 2002, pp. 2, 5.)

Thus, the Legislature intended to expand the protections against vote dilution provided by the federal Voting Rights Act. It would be inconsistent with the evident legislative intent to expand protections against vote dilution to narrowly limit the scope of preliminary injunctive relief as defendant asserts. Logically, the appropriate remedies language in section 14029 extends to pre-election orders of the type approved under the federal Voting Rights Act. In cases subject to the federal Voting Rights Act, courts have upheld orders enjoining an election in preclearance cases. (*Lopez v. Monterey County* (1996) 519 U.S. 9, 21-23; *Clark v. Roemer* (1991) 500 U.S. 646, 654-655.) The order at issue which merely limits certification is more narrow in its effect than an outright injunction of an election.

Finally, as noted, remedial legislation is to be liberally or broadly construed. Sections 14025 through 14032 in general and section 14029 specifically fall within the definition of remedial legislation. The sponsor's comments which appear in two Assembly committee report are as follows: "'Once the problem is judicially established, the bill provides courts with the authority to fashion appropriate legal remedies for the problem. In California, we face a unique situation where we are all minorities. We need statutes to ensure that our electoral system is fair and open. This measure gives us a tool to move us in that direction: it identifies the problem, gives tools to deal with the problem and provides a solution.'" (Assem. Com. on Elections, Reapportionment and Constitutional Amendments, *op. cit.*, Apr. 9, 2002, p. 3; Assem. Com. on Judiciary, *op. cit.*, Jun. 4, 2002, p. 2.) Other committee reports synthesize the sponsor's views: "According to the author, this bill addresses the problems associated with block voting, particularly those associated with racial or ethnic groups. This is important for a state like California to address due to its diversity." (Sen. Com. on Elections and

26

Reapportionment, *op. cit.*, May 2, 2001, p. 3; Sen. Rules Com., Office of Sen. Floor Analyses, *op. cit.*, June 1, 2001, p. 5.) Thus, section 14029 is to be broadly construed to remedy dilution of the votes of protected classes; not narrowly as asserted by defendant.

To sum up, section 14029 is an exception to the restrictions in Code of Civil Procedure section 526, subdivision (b)(4) and Civil Code section 3423, subdivision (d). Section 14029 is a later enacted more specific remedial statute. The Legislature intended to expand protections against vote dilution over those provided by the federal Voting Rights Act. It is incongruous to intend this expansion of vote dilution liability but then constrict the available remedies in the electoral context to less than those in the Voting Rights Act. The Legislature did not intend such an odd result. And, section 14029 must be broadly construed as it is a remedial statute. Collectively, these statutory construction principles lead us to resolve the ambiguity as to what is an appropriate remedy within the meaning of section 14029 in plaintiffs' favor.

Here, the upshot of the trial court's order is to defer certification of the election results while a final plan is promptly prepared. We repeat--defendant does not challenge the trial court's finding made after a full trial that the at-large system diluted the vote of Latinas, Latinos and African-Americans. That trial court's unchallenged findings are presumed to be correct. If this were a case where a trial court's findings were issued prior to full trial on the merits, the issue may be different. However, this is a case where the presumptively correct findings of the trial court were issued after a full trial. Nor do we address the issue of whether a trial court has discretion to stay certification of election results but then unreasonably delays selection of a remedy. Here, the trial was completed, the statement of decision's findings are unchallenged and presumed correct and the trial court was proceeding apace to select its final plan. It was lawful for the injunction order to issue and, given the uncontradicted evidence of vote dilution, it was prudent to do so. No abuse of discretion occurred.

27

## VI.  DISPOSITION

The preliminary injunction is affirmed insofar as it enjoins certification of the city council election results pending implementation of the trial court's final plan.  Plaintiffs, Juan Juaregui, Nigel Holly and V. Jesse Smith, shall recover their costs incurred on appeal from defendant, City of Palmdale.  Any attorney's fee request must be brought pursuant to California Rules of Court, rules 3.1702(c) and 8.278(c).

**CERTIFIED FOR PUBLICATION**

TURNER, P. J.

I concur:

KRIEGLER, J.

Jauregui v. City of Palmdale

B251793


MOSK, J., Concurring



I concur.

Code of Civil Procedure section 526, subdivision (b) and Civil Code section 3423, subdivision (d) are not inapplicable under the theory that Election Code section 14029 is a later enacted and more specific injunctive relief provision. The provision in Election Code section 14029 that "the court shall implement appropriate remedies" is not more specific than the anti-injunction language of Code of Civil Procedure section 526, subdivision (b) and Civil Code section 3423, subdivision (d). Indeed, injunctive relief in contravention of those statutes would not be "appropriate."

Code of Civil Procedure section 526, subdivision (b) and Civil Code section 3423, subdivision (d) preclude an injunction, "To prevent the execution of a public statute, by officers of the law, for the public benefit." It is not clear if this means the execution of the statute for the public benefit or the statute itself is for the public benefit. The statute for the certification of the election, Election Code sections 10262, subdivision (b) and 10263, are for the public benefit. The execution of the statutes may not be for the public benefit because the election has been determined to contravene the California Voting Rights Act. (Elec. Code, §§ 14025-14032.) *Wright v. Jordan* (1923) 192 Cal. 704, 710 does not answer this question because in that case the election was deemed to be valid, and thus an injunction preventing certification of the election would contravene Code of Civil Procedure section 526, subdivision (b) and Civil Code section 3423, subdivision (d).

It has been said that an unconstitutional statute or a statute valid upon its face but unconstitutionally applied may be enjoined. (See *Brock v. Superior Court* (1939) 12

Cal.2d 605, 609-610; 6 Witkin, Cal. Procedure (5th ed. 2008) Provisional Remedies, § 331, p. 275.)  Also, Code of Civil Procedure section 526, subdivision (b) and Civil Code section 3423, subdivision (d) "do not bar judicial action where the invalidity of the statute under which [the public official] is acting is shown."  (*Financial Indem. Co. v. Superior Court* (1955) 45 Cal.2d 395, 402.)  Moreover, "If law enforcement officers attempt to enforce a criminal statute arbitrarily and in a discriminatory manner, such action may be restrained by the courts."  (*Downing v. Cal. State Board of Pharmacy* (1948) 85 Cal.App.2d 30, 36.)

Palmdale Municipal Code section 2.08.020 provides for elections of city council members on a citywide basis.  That ordinance was found to be invalid as applied, based on the trial court's finding that the application of the ordinance violated the California Voting Rights Act (Elec. Code, § 14025 et seq.), which was enacted "to implement the guarantees of Section 7 of Article I and of Section 2 of Article II of the California Constitution."  (Elec. Code, § 14031.)  It is arguable that enjoining the certification of an election that is tainted by the invalid application of an ordinance under the California Voting Rights Act is the equivalent of enjoining the enforcement of an ordinance unconstitutional or invalid in its application.  Although not free from doubt, I conclude that the trial court could issue a preliminary injunction based on a finding that the Palmdale ordinance violated the California Voting Rights Act.

Another issue that is difficult is whether election in one municipality is a matter of statewide concern.  Interestingly, California Constitution, Article XI, section 5, subdivision (b), specifies that "the conduct of city elections" is a proper subject of a city charter.  *People ex rel. Seal Beach Police Officers Assn. v. City of Seal Beach* (1984) 36 Cal.3d 591, 599-600 does, however, suggest that the subjects set forth in California Constitution Article XI, section 5, subdivision (b) are subject to the same analysis as applied to subdivision (a) in determining if state law supersedes a charter city provision.

2

I concur on the basis that the trial court did not abuse its discretion in issuing the preliminary injunction. (*Robbins v. Superior Court* (1985) 38 Cal.3d 199, 205-206.)[1]


MOSK, J.

---

[1] It does seem incongruous that the injunction perpetuates those in office who were selected by what is deemed to be an election that violated the law and prevents the seating of a minority candidate who was elected at the last election.